## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ESTER LELCHOOK, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Case No.: 16-01550 (RC/RMM) |
| | ) |
| SYRIAN ARAB REPUBLIC, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## REPORT AND RECOMMENDATION

Plaintiffs Ester Lelchook, Michal Lelchook, Yael Lelchook, Alexander Lelchook, and Doris Lelchook (collectively "Plaintiffs" or "the Lelchooks"), brought this action under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq.,* against Defendant, the Syrian Arab Republic ("Defendant" or "Syria"), seeking damages for wrongful death and intentional infliction of emotional distress, arising from the death of David Martin Lelchook, a United States citizen. *See* Corrected Compl. ("Compl.") ¶¶ 1–36, ECF No. 2. The Clerk of Court entered default against Syria on September 20, 2017, and Plaintiffs now seek default judgment as to liability. *See* Default, ECF No. 15; Pls.' Mot. for Default J. as to Liability ("Pls.' Mot."), ECF No. 17. Plaintiffs' Motion for Default Judgment as to Liability ("Motion") was referred to the undersigned for a Report and Recommendation. *See* Order Referring Case, ECF No. 18. Having considered the Motion and the relevant portions of the record, and for the reasons discussed below, the undersigned recommends that the Court GRANT-IN-PART and DENY-IN-PART Plaintiffs' Motion.

# BACKGROUND

## I.      Factual Background[1]

Hezbollah is a terrorist organization that operates out of Lebanon.  *See* Pls.' Mot., Ex. A. ("Schenker Decl.") at 6, ECF No. 17-2 (quoting The Syria Accountability and Lebanese Sovereignty Restoration Act of 2003, PL 108-175);[2] *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 46 (D.D.C. 2009); FED. R. EVID. 201.  Iran created Hezbollah in the early 1980s as a proxy militia "primarily focused on fighting Israel."  Schenker Decl. at 5.  Syria, which already was an ally of Iran, additionally and independently established ties with Hezbollah.  *Id.*

Since Hezbollah's establishment in the 1980s, Syria has "served as a key point of transshipment of Iranian weapons and military materiel" to Hezbollah.  *Id.* at 4.  After Bashar al Assad became the president of Syria in 2000, Syria "emerged as a leading source of weapons to Hezbollah" and began direct shipment of its own military materiel.  *Id.* at 4, 7.  As a result, since 2001, Syria has provided weapons and ammunition to Hezbollah by two means: (1) transshipment of military materiel from Iran; and (2) directly providing military materiel from Syria.  *Id.* at 5–9.  The provision of weapons from Syria to Hezbollah during this time resulted in a significant stockpile of rocketry by 2006.  *Id.* at 7–9.

---

[1]  The facts discussed in the Background are drawn from Plaintiffs' complaint and the declaration of Plaintiffs' expert witness on Hezbollah and Syria, David Schenker, attached to Plaintiffs' Motion.  *See* Pls.' Mot, Ex. A ("Schenker Decl."), ECF No. 17-2.  As further discussed below, Mr. Schenker bases his testimony on his expertise and personal research including primary sources and interviews.  *See id.  See generally Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 28 (D.D.C. 2016) (relying on the complaint and an informed expert declaration in setting forth the factual background).  The undersigned will make specific findings of fact as part of the analysis of liability.  *See infra* Discussion.

[2]  Page numbers cited in this Report and Recommendation reference the ECF page numbers present in the header of the document.

In the summer of 2006, Hezbollah and Israel were at war for thirty-three days from July 12 to August 14, 2006. Schenker Decl. at 4. During this time Hezbollah fired almost 4,000 rockets into Israel. *Id.* at 7. Of these, Hezbollah launched approximately 3,500 shorter range missiles into Israel from Lebanon. *Id.* at 8–9. These missiles were primarily either transshipped through Syria or manufactured directly by Syria. *Id.* at 7–9. Hezbollah was the only known group firing missiles into Israel from Lebanon during this time. *Id.* at 9.

The present action arises out of the events that occurred on August 2, 2006. On that day, a rocket attack from Hezbollah struck Kibbutz Saar, a kibbutz in the northern region of Israel, where David Lelchook resided. *See id.* at 9; Compl. ¶¶ 14–16. David Lelchook was traveling to the safe room of his home when he was struck by shrapnel from one of the missile strikes. Compl. ¶¶ 14–15. He subsequently died of his injuries. *Id.* at ¶ 16.

## II.     Procedural Background

The Lelchooks filed this action on August 1, 2016 and corrected their Complaint on August 3, 2016. *See generally* Initial Compl., ECF 1.; Compl.[3] The Lelchooks effected service on May 29, 2017 and filed proof of service with the Court on September 13, 2017. *See* Return of Serv./Aff., ECF No. 13. Pursuant to 28 U.S.C. § 1608, Syria had until sixty days after service, or July 28, 2017, to file an answer or otherwise respond to the complaint. 28 U.S.C. § 1608(d).

---

[3] The Lelchooks initiated this action within the applicable statute of limitations. *Cf. Sheikh v. Republic of Sudan*, 308 F. Supp. 3d 46, 51 (D.D.C. 2018), *reconsideration denied sub nom. Kinyua v. Republic of Sudan*, No. CV 14-2118 (JDB), 2018 WL 2272779 (D.D.C. May 17, 2018) (determining that special circumstances existed to exercise the court's discretion and consider *sua sponte* the FSIA's non-jurisdictional statute of limitations). Under the FSIA, the Lelchooks had until August 2, 2016 to file their claim. *See* 28 U.S.C. § 1605A(b) ("an action may be brought or maintained . . . if the action is commenced . . . not later than the latter of — (1) 10 years after April 24, 1996; or (2) 10 years after the date on which the cause of action arose"). The Lelchooks timely filed this action on August 1, 2016, less than ten years after the August 2, 2006 rocket attack.

Syria filed no response, and the Lelchooks requested that the Clerk of Court enter default against Syria. *See* Decl. in Supp. of Default, ECF No. 14. On September 20, 2017, the Clerk of Court entered default against Syria. *See* Clerk's Entry of Default, ECF No. 15.

Approximately three months after default was entered, the Lelchooks filed the instant Motion for Default Judgment as to Liability. *See generally* Pls.' Mot. The Lelchooks submitted six exhibits in support of the motion, including two expert declarations, copies of the passports of David Lelchook, Michal Lelchook, and Yael Lelchook, and a copy of an Inheritance Order issued by the Inheritance Registrar in Israel. *See* Pls.' Mot, Pls.' Mem. in Supp. of Pls.' Mot. for Default J. as to Liability ("Pls.' Mem."), Exs. A–F, ECF Nos. 17-2–17-7. Judge Contreras subsequently referred the Motion to the undersigned for resolution. *See* Order Referring Case, ECF 18.

On February 7, 2018, the undersigned directed the Lelchooks to submit a status report regarding how they would like to proceed in the matter and whether they believed an evidentiary hearing was necessary. *See* 2/7/2018 Minute Order. In response, the Lelchooks advised the Court that if a hearing were held, they would present the documentary evidence already submitted with Plaintiffs' Motion, in addition to one expert to testify regarding Hezbollah and Syria's support of that organization. *See* Pls.' Status Report at 2–3, ECF No. 19. The Lelchooks further indicated that upon any entry of default judgment regarding liability, they intend to submit documentary evidence regarding the damages each plaintiff suffered. *Id.* at 3. The Lelchooks have submitted two supplemental filings in support of the motion. On March 26, 2018, Plaintiffs submitted Doris Lelchook's and Alexander Lelchook's birth certificates. *See* Notice of Suppl. Filing of Evid. in Supp. of Pls.' Mot., ECF No. 20; *see also* Pls.' Mem. at 8 n.3 (representing that the "Passports/birth Certificates of Alexander Lelchook and Doris Lelchook"

would be provided in a supplemental filing).  And on November 13, 2018, the Lelchooks

submitted a supplemental memorandum, including six declarations, in response to the Court's

September 17, 2018 Minute Order, which requested additional information regarding the

Lelchooks' claim for intentional infliction of emotional distress, and clarification of whether

Ester Lelchook pursues any claims in her individual capacity.  *See* Pls.' Suppl. Mem. in Supp. of

Mot. for Default J. as to Liability ("Pls.' Suppl. Mem."), ECF No. 22.

## LEGAL STANDARD

Federal Rule of Civil Procedure 55 establishes a two-step procedure that a plaintiff must

follow to obtain default judgment.  First, the plaintiff must ask the Clerk of Court to enter default

based on a party's failure "to plead or otherwise defend" in response to the complaint.  FED. R.

CIV. P. 55(a).  Second, after the Clerk has entered default, the plaintiff must file a motion for

default judgment.  *Id.* 55(b)(2).  Although courts strongly prefer to resolve claims on the merits,

default judgment is appropriate where "the adversary process has been halted because of an

essentially unresponsive party."  *J.D. Holdings, LLC v. BD Ventures, LLC*, 766 F. Supp. 2d 109,

113 (D.D.C. 2011) (quoting *Cumis Ins. Soc'y, Inc. v. Billups*, No. 10-1478 (ESH), 2010 WL

4384228, at *2 (D.D.C. Nov. 4, 2010)) (internal quotation marks omitted); *see Darby v.

McDonald*, 307 F.R.D. 254, 257 (D.D.C. 2014) (noting courts disfavor default judgments and

will resolve disputes based on their merits when possible).

In FSIA actions, a claimant is "not automatically entitle[d] . . . to judgment when a

foreign state defaults."  *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 838 (D.C. Cir. 2009)

(citing *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003)); *see also Mwani

v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005).  Instead, default judgment in FSIA cases is

appropriate only when:

> (1) the Court has subject matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendants, (3) the plaintiffs have presented satisfactory evidence to establish their claims against the defendants, and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek.

*Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017); *see also* 28 U.S.C. § 1608.

Accordingly, the Court must first confirm "that it has subject matter jurisdiction over the claims, [and] personal jurisdiction over the defendant." *Sterling Merch. Fin. Ltd. v. Republic of Cabo Verde*, 261 F. Supp. 3d 48, 50 (D.D.C. 2017); *see also Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 79 (D.D.C. 2017). The burden of establishing the Court's jurisdiction lies with the party seeking default judgment. *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 190 (D.D.C. 2017) (citing *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016). Next, the Court must determine whether the plaintiff has "establishe[d] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). To meet that burden, a plaintiff "must present a legally sufficient prima facie case, in other words, 'a legally sufficient evidentiary basis for a reasonable jury to find for the plaintiff.'" *Kilburn v. Islamic Republic of Iran*, 699 F. Supp. 2d 136, 150 (D.D.C. 2010) (quoting *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 63 (D.D.C. 2008), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011)). This requirement essentially parallels the requirements for a default judgment against the United States. *See Braun*, 228 F. Supp. 3d at 74 (quoting *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014)) ("'This provides foreign sovereigns a special protection akin to that assured the federal government by Fed. R. Civ. P. 55(e),' which has been renumbered by the 2007 amendment to Rule 55(d)."). *Compare* 28 U.S.C. § 1608(e) *with* FED. R. CIV. P. 55(d) ("A default judgment may be entered against the United States . . . only if the claimant establishes a claim or right to relief by evidence

that satisfies the court.").  Finally, the plaintiff must demonstrate that he or she is entitled to damages.  *See Braun*, 228 F. Supp. 3d at 75.

A plaintiff may submit multiple types of evidence to support FSIA claims, including "testimony, documentation, and affidavits."  *Miango v. Democratic Republic of Congo*, 288 F. Supp. 3d 117, 123 (D.D.C. 2018) (citing cases).  Given the difficulty of obtaining direct proof of the types of conduct for which the FSIA provides a remedy, the FSIA permits courts to credit indirect evidence and to impose a lower evidentiary burden than they might apply in a different context.  *See Owens v. Republic of Sudan* (*Owens II*), 864 F.3d 751, 785 (D.C. Cir. 2017). However, "[i]n order to issue a default judgment under § 1608(e), a court must base its findings of fact and conclusions of law upon evidence admissible under the Federal Rules of Evidence." *Id.* at 786 (citing *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1049 (D.C. Cir. 2014)).  Although the court "may not unquestioningly accept a complaint's unsupported allegations as true," *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012), "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true."  *Thuneibat*, 167 F. Supp. 3d at 33 (citing cases); *see also Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 157 (D.D.C. 2017).

## DISCUSSION

As the Clerk of Court has entered default against Syria, the Court must consider whether the Lelchooks are entitled to default judgment on liability.  The following analysis will first evaluate whether and to what extent the expert testimony submitted by the Lelchooks provides a satisfactory evidentiary basis for the default judgment analysis.  The undersigned will then evaluate whether the Lelchooks have established: (1) subject matter jurisdiction; (2) personal jurisdiction; and (3) their claims for liability against Syria.  This Report and Recommendation

will not evaluate the Lelchooks' entitlement to damages because the Motion seeks default judgment only as to liability.  *See* Pls.' Mem. at 14.

I.      **Admissibility of Plaintiffs' Expert Testimony**

When evaluating FSIA claims, courts may rely on expert testimony to determine jurisdiction, liability, or the factual basis of the plaintiff's claims.  *See Owens II*, 864 F.3d at 787–88.  Indeed, given the "dearth of firsthand evidence, reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception."  *Id.* at 787.  The expert testimony need only be "admissible" and "satisfactory to the court."  *See id.* at 786–87.  Expert testimony does not lose its admissibility or probative value simply because there is no direct evidence of terrorist activities or eyewitness testimony to corroborate the experts' conclusions.  *See id.* at 788 ("[C]ases in this Circuit and in others have repeatedly sustained jurisdiction or liability or both under the terrorism exception to the FSIA and in other terrorism cases based solely upon expert testimony.").  Finally, expert testimony may be presented solely through written testimony, because the FSIA "does not actually demand a hearing or live testimony; it demands [only] <u>evidence</u>," which can consist of sworn affidavits.  *Owens v. Republic of Sudan* (*Owens I*), 174 F. Supp. 3d 242, 280 (D.D.C. 2016), *aff'd*, 864 F.3d 751 (D.C. Cir. 2017); *see also Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 43 (D.D.C. 2008) (noting that courts reviewing FSIA claims may rely on affidavits and are not required to hold evidentiary hearings).

The Lelchooks have submitted two expert declarations in support of the Motion: (1) the declaration of David Schenker, as an expert witness on Hezbollah and Syria, *see* Schenker Decl.; and (2) the declaration of Ovadia Gabbay,[4] a proposed expert witness on Israeli probate law,

---

    4   Ovadia Gabbay's name appears with two different spellings in the record: "Ovadia" and

pursuant to Federal Rule of Civil Procedure 44.1, *see* Pls.' Mot., Ex. F ("Gabbay Decl."), ECF

No. 17-7.  Federal Rule of Evidence 702, which governs the admissibility of the Schenker

Declaration, provides:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized
>> knowledge will help the trier of fact to understand the
>> evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and
>> methods; and
>>
>> (d) the expert has reliably applied the principles and
>> methods to the facts of the case.

FED. R. EVID. 702.  Federal Rule of Civil Procedure 44.1, which governs the Court's reliance on

Mr. Gabbay's declaration, permits the Court to consider testimony to establish the meaning and

scope of foreign law.  *See* FED. R. CIV. P. 44.1.  Both declarations satisfy the applicable rules and

satisfactorily demonstrate that Mr. Schenker and Mr. Gabby are qualified to testify as experts.

Mr. Schenker is qualified as an expert on Hezbollah and Syria's relationship with

Hezbollah.  *See* FED. R. EVID. 702.  Mr. Schenker's declaration clearly sets forth his education,

knowledge, and experience in the field.  Mr. Schenker worked at the Washington Institute for

Near East Policy from 1998 to 2002, and from 2006 through 2017, and much of his work has

focused on Syria and its support for terrorism.  *See* Schenker Decl. at 2.  He traveled to Syria on

six occasions and has met with Hezbollah officials in Lebanon.  *See id.*  From 2002 through 2006

he worked in the Office of the Secretary of Defense, and in that capacity was "the Pentagon's top

---

"Ovadya."  The undersigned utilizes "Ovadia" as that corresponds with what appears to be
the declarant's stamp accompanying his signature on each page of the declaration.  *See
generally* Pls.' Mot., Ex. F ("Gabbay Decl."), ECF No. 17-7.

policy aide on the Arab countries of the Levant, [and] responsible for advising the secretary and other senior Pentagon leadership on the military and political affairs of Syria" and other countries.  Schenker Decl. at 2.  Mr. Schenker's declaration also identifies the facts on which he bases his opinion, and his description of his methodology demonstrates that his opinion results from reliable principles and methods that Mr. Schenker has reasonably applied to the facts of this case.  It is sufficiently comprehensive to be satisfactory to the Court, and the undersigned will therefore consider the Schenker Declaration as expert testimony germane to the jurisdictional and liability questions at issue in this action.

The Lelchooks have also established that the Court may consider Mr. Gabbay's declaration to resolve questions of Israeli probate law.  Federal Rule of Civil Procedure 44.1 permits courts determining foreign law to consider "any relevant material or source, including testimony, whether or not . . . admissible under the Federal Rules of Evidence."  *See* FED. R. CIV. P. 44.1.  Mr. Gabbay's declaration demonstrates that he is a knowledgeable expert on Israeli law, and the Court will therefore rely on his testimony for that purpose.  *See* Gabbay Decl. at ¶ 2.

## II.     Subject Matter Jurisdiction

Foreign states generally are immune from suit in United States courts, subject to certain exceptions enumerated in the FSIA.  28 U.S.C. § 1604; *see Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015); *Cohen*, 238 F. Supp. 3d at 79.  28 U.S.C. § 1330 gives district courts "original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . as to any claim for relief *in personam* with respect to which the foreign state is not entitled to immunity" under the FSIA.  28 U.S.C. § 1330(a).  Accordingly, the Court may exercise subject matter jurisdiction over this nonjury civil action if it finds that Syria is subject to an exception waiving immunity under the FSIA.  *See Fritz v. Islamic Republic of*

*Iran*, 320 F. Supp. 3d 48, 75 (D.D.C. 2018); *see also Thuneibat*, 167 F. Supp. 3d at 34 (noting that court could exercise jurisdiction over Syria in a "nonjury civil action" if the FSIA does not entitle Syria to immunity).

The FSIA's "terrorism exception," codified at 28 U.S.C. § 1605A, is the exception to foreign state immunity pertinent to this case. *See Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1318 (describing the scope of the terrorism exception). The FSIA provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States" where

> money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, . . . or the provision of material support or resources for such an act if . . . engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A. To establish subject matter jurisdiction under this exception, a plaintiff must prove that:

> (1) the foreign country was designated a state sponsor of terrorism at the time of the act;
>
> (2) the claimant or the victim was a national of the United States at that time
>
> (3) in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim; and
>
> (4) the plaintiff seeks monetary damages for personal injury or death caused by torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act, if engaged in by an official, employee, or agent of a foreign country.

*Braun*, 228 F. Supp. 3d at 75–76 (quoting *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a))); *see also Cohen*, 238 F. Supp. 3d at 80.

The Lelchooks have satisfactorily proven the first, second, and fourth elements of the terrorism exception, as explained below.  The third element is not applicable to this case.[5]

### A.      Syria was Designated a State Sponsor of Terrorism at the Time of the Act

The Lelchooks have satisfactorily proven the first element, which asks whether the country was a state sponsor of terrorism at the time of act giving rise to the lawsuit.  Syria has been on the United States Department of State's list of State Sponsors of Terrorism continuously since 1979.  *See* Schenker Decl. at 4; *see also Thuneibat*, 167 F. Supp. 3d at 34 ("Syria has been continuously designated a state sponsor of terrorism . . . .").

### B.      The Victim was a National of the United States at the Time

The Lelchooks also have satisfactorily proven the second element, which asks whether the claimant or the victim was a "national of the United States" at the time of the incident.  28 U.S.C. § 1605A(a)(2)(A)(ii)(I).  The passport of the victim, David Lelchook, demonstrates that he was a United States national at the relevant time.  *See* Pls.' Mot., Ex. B, ECF 17-3 (copy of David Lelchook's United States passport); *see also Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 220 (D.D.C. 2012), *aff'd*, 554 F. App'x 16 (D.C. Cir. 2014) (relying on a passport in determining citizenship).

### C.      Plaintiffs seek Monetary Damages for Death Caused by the Provision of Material Support or Resources for an Extrajudicial Killing

Finally, the Lelchooks have satisfactorily proven the fourth element, which asks whether the monetary damages sought arise from Syria's "provision of material support or resources" for

---

[5]   The incident at issue in this action did not occur in Syria but occurred in Israel.  *See* Pls.' Mot., Ex. E ("Inheritance Order") at 2, ECF 17-6; Schenker Decl. at 4, 9.  Accordingly, as the incident did not occur "in the foreign state against which the claim has been brought," the Lelchooks need not establish that they "afforded the foreign state a reasonable opportunity to arbitrate the claim."  28 U.S.C. § 1605A(a)(2)(A)(iii); *see also Cohen*, 238 F. Supp. 3d at 80 n.5.

an act of extrajudicial killing.  28 U.S.C. § 1605A(a)(1).  The Lelchooks clearly seek monetary

damages for David Lelchook's death, *see* Compl. ¶¶ 29, 36.  Accordingly, the analysis below

evaluates whether those damages arise out of an extrajudicial killing for which a state actor

(Syria) has provided material support or resources.

       *1.*    *Extrajudicial Killing*

The FSIA defines "extrajudicial killing" by reference to the Torture Victim Protection

Act of 1991 ("TVPA").  *See* 28 U.S.C. § 1605A(h)(7).  Under the TVPA, an extrajudicial killing

is "a deliberated killing not authorized by a previous judgment pronounced by a regularly

constituted court affording all the judicial guarantees which are recognized as indispensable by

civilized peoples."  28 U.S.C. § 1350 note (section 3(a)); *see also Owens II*, 864 F.3d at 770

(defining extrajudicial killing as "(1) a killing; (2) that is deliberated; and (3) is not authorized by

a previous judgment pronounced by a regularly constituted court").  That definition "does not

include any such killing that, under international law, is lawfully carried out under the authority

of a foreign nation."  28 U.S.C. § 1350 note (section 3(a)).  In sum, "[a] killing runs afoul of the

statute only if it occurs outside the normal legal process."  *Han Kim*, 774 F.3d at 1047.

This case clearly involves a killing.  On August 2, 2006, David Lechook was killed when

a missile hit Kibbutz Saar.  *See* Pl.'s Mem. at 11; Schenker Decl. at 9.  Plaintiffs' expert opines

that "Hezbollah fired the rocket that killed David Lelchook."  Schenker Decl. at 9.  Mr. Schenker

bases this conclusion on, *inter alia*, the fact that on August 3, 2006, Hezbollah claimed

responsibility for launching 300 missiles into northern Israel on August 2, 2006, and that "[n]o

other forces in Lebanon were firing missiles or rockets against Israel during this period."  *Id.*

(citing statements made by Hassan Nasrallah, leader of Hezbollah).  Kibbutz Saar is located in

the geographic area of northern Israel.  *See id.*  Accordingly, there is satisfactory evidence that

David Lelchook was killed by a missile fired by Hezbollah on August 2, 2006.  *See* Schenker
Decl. at 9.

    The evidence also demonstrates that the killing was "deliberated."  "A 'deliberated'
killing is simply one undertaken with careful consideration, not on a sudden impulse." *Fritz*, 320
F. Supp. 3d at 84 (quoting *Owens I*, 174 F. Supp. 3d at 263) (internal quotation marks omitted)).
Mr. Schenker's expert testimony demonstrates that the missile attack that caused David
Lelchook's death transpired as part of a war between Israel and Hezbollah that occurred from
July 12 to August 14, 2006.  Schenker Decl. at 4. Therefore, it was not a random occurrence.
The coordinated movement of weapons to Hezbollah further demonstrates the planning and
deliberation underlying the missile attack.  *See generally id.* at 5–7 (explaining how Iranian and
Syrian weapons were transferred to Hezbollah through and by Syria).  In sum, this attack
"involved substantial preparation, meticulous timing, and coordination across multiple countries
in the region," and therefore was deliberated.  *Owens II*, 864 F.3d at 770 (citing *Mamani v.
Berzain*, 654 F.3d 1148, 1155 (11th Cir. 2011)).

    Finally, the record establishes that this killing was neither carried out by a prior judgment
of a regularly constituted court, *Owens II*, 864 F.3d at 770, nor "lawfully carried out under the
authority of a foreign nation," 28 U.S.C. § 1350 note (section 3(a)).  As noted, Hezbollah
asserted responsibility for this attack.  *See* Schenker Decl. at 9.  Given that Hezbollah is a
terrorist organization, and that the missile attack occurred during a war between Israel and
Hezbollah, the Court is satisfied that the killing occurred outside of any formal legal process.
*See* Schenker Decl. at 6, 9; *Han Kim*, 774 F.3d at 1050 ("With respect to extrajudicial killing,
[plaintiffs] need demonstrate only that the DPRK killed the [victim] without due process.").

        2.      *Syria's Provision of Material Support or Resources for Hezbollah's Extrajudicial Killing*

Having found that the missile attack qualifies as an extrajudicial killing, the Court next considers whether Syria provided material support or resources for this act. *See Owens II*, 864 F.3d at 778 (finding that a court may assert jurisdiction over FSIA claims arising from a non-state actor's extrajudicial killing if plaintiffs "adequately demonstrate[]" that a state actor provided "material support" for the act). This inquiry requires consideration of: (1) whether Syria, "through its officials acting within the scope of their official duties, provided material support or resources" to Hezbollah; and (2) whether the extrajudicial killing was "caused by this support." *Foley*, 249 F. Supp. 3d at 204 (internal quotation marks omitted); *see also Owens II*, 664 F.3d at 778; *Fritz*, 320 F. Supp. 3d at 84.

        a.      <u>Material Support or Resources</u>

The FSIA defines "material support or resources" as

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1); *see also* 28 U.S.C. § 1605A(h)(3). The Lelchooks have proven, by satisfactory evidence, that Syria, through its officials, provided Hezbollah with material support or resources.

According to Mr. Schenker, "[i]t has long been known that Syria has been the key source of Hezbollah's arsenal," and his declaration describes the ongoing transfer of weapons to Hezbollah from and via Syria. Schenker Decl. at 5; *see id.* at 4 (opining that the Syrian regime under President Assad "was singularly responsible for establishing Hezbollah's arsenal of

rockets and missiles"). Specifically, Mr. Schenker describes a two-pronged supply chain of weapons from Syria to Hezbollah consisting of: (1) Iranian weapons transshipped to Hezbollah through Syria; and (2) weapons from Syria's own stocks that Syria has directly provided to Hezbollah. Schenker Decl. at 5–9. Mr. Schenker's conclusions are well supported and provide credible evidence of Syria's material support for Hezbollah. *See generally Owens II*, 864 F.3d at 790 (noting that courts must "engage with the underlying facts in order to explain why it admitted and credited the experts' opinions").

Mr. Schenker cites numerous sources that provide evidentiary support for his conclusion that Syria continually provided weapons to Hezbollah during the relevant time period, including statements of government and organization officials, government reports, and other experts. *See* Schenker Decl. at 5–9. For example, U.S. government officials, including then-Secretary of State Colin Powell in May 2003 and then-President George W. Bush in July 2006, publicly acknowledged Syrian government-sponsored support for Hezbollah. *Id.* at 5. In addition, both the 2004 and 2005 U.S. State Department "Country Reports on Terrorism" also identified Syria's ongoing political and material support to Hezbollah. *Id.* at 7–8 (quoting U.S. DEP'T OF STATE, COUNTRY REPORTS ON TERRORISM (2004), https://www.state.gov/j/ct/rls/crt/c14813.htm; U.S. DEP'T OF STATE, COUNTRY REPORTS ON TERRORISM (2005), https://www.state.gov/j/ct/rls/crt/c17689.htm). Likewise, Mr. Schenker highlights U.S. Congress's concern as expressed in the "Findings" section of The Syria Accountability and Lebanese Sovereignty Restoration Act of 2003. *See id.* at 6. Congress found that Syria provides "safe haven and support to several terrorist groups," including Hezbollah, which "operate[s] in areas of Lebanon . . . and receive[s] supplies from Iran through Syria." Syria Accountability and Lebanese Sovereignty Restoration

Act of 2003, Pub. L. 108-175, § 2, 117 Stat. 2482 (2003) (internal quotation marks omitted); *see also* Schenker Decl. at 6.

In addition, Mr. Schenker considered Iran and Hezbollah's official recognition of Syria's support for Hezbollah.  Hezbollah leader Hassan Nasrallah, for instance, stated in an interview that "[d]uring the [2006] war [with Israel], the transfer of arms from Syria did not stop." Schenker Decl. at 6 (second alteration in original).  In another instance, "Iran's Beirut-based Chief of Staff armed forces Major General Mohamad Bagheri said in an interview that Hezbollah had employed Iranian-made missiles manufactured in Aleppo, Syria, during the July 2006 war with Israel." *Id.* at 8.

The fact that the material Mr. Schenker relies upon includes information that may be hearsay does not diminish the reliability of his opinion.  "[E]xperts may rely upon hearsay evidence in forming their admissible, professional opinions." *Owens II*, 864 F.3d at 791; *see also Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 175 (D.D.C. 2016) ("[A]n expert witness in terrorism cases [may] rely on hearsay evidence in formulating his or her *admissible* expert opinion."); *Owens I*, 174 F. Supp. 3d at 279–80 (rejecting as "flat wrong" Sudan's contention that an expert's conclusions in a terrorism case are inadmissible because they are based on hearsay).  Given the covert nature of terrorism, and state sponsors of terrorisms' skill at hiding their material support of terrorist organizations, "it is hard to imagine what other than hearsay an expert on terrorism could use to formulate his opinion." *Owens II*, 864 F.3d at791.  The key is whether the expert merely serves "as [a] conduit[]" for the introduction of hearsay, or whether the expert reaches his own conclusions based in part on his personal experience. *Flanagan,* 190 F. Supp. 3d at 173; *cf. Owens II*, 864 F.3d at 791 (finding admissible an expert opinion drawn from "materials admitted at the evidentiary hearing and sources

encountered in their research and professional experience" such that a "'layperson' could not reliably have reached the same conclusions as the experts").

Mr. Schenker's conclusion that Syria provided the rocket that killed David Lelchook was based on his "expertise and [his] research," Schenker Decl. at 9, and in his declaration he asserts facts and conclusions about Syria's role in the provision of weapons instead of merely parroting conclusions from other sources. *See* Schenker Decl. at 5–9. He relied on the type of sources — such as government intelligence reports and public statements by foreign officials and individuals affiliated with Hezbollah — that courts have "consistently" accepted as "an adequate basis for expert testimony on terrorism." *Owens* II, 864 F.3d at 791. Mr. Schenker's experience at the Washington Institute for Near East Policy, where Syria was a principal focus of his work, his tenure in the Office of the Secretary of Defense, his travel to Syria, and his meetings with Hezbollah officials, provide an ample basis for his expert conclusions. Therefore, Mr. Schenker's informed expert opinion provides satisfactory evidence that Syria provided Hezbollah with material support and resources.

### b.   Causation

Finally, the Lelchooks must demonstrate that the material support or resources that Syria provided to Hezbollah caused the extrajudicial killing. 28 U.S.C. § 1605A(a)(1); *see also Fritz*, 320 F. Supp. 3d at 85. To make this showing, "the statute require[s] only a showing of 'proximate cause.'" *Fritz*, 320 F. Supp. 3d at 85 (quoting *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)) (alteration in original) (internal quotation marks omitted); *Foley*, 249 F. Supp. 3d at 204 (quoting *Ben-Rafael*, 540 F. Supp. 2d at 54). Plaintiffs may establish proximate cause by demonstrating "a reasonable connection between the material support provided and the ultimate act of terrorism." *Foley*, 249 F. Supp. 3d

at 204 (quoting *Owens v. Republic of Sudan* (*Owens*), 826 F. Supp. 2d 128, 151 (D.D.C. 2011))

(internal quotation marks omitted).  Specifically, to demonstrate that Syria's actions proximately

caused David Lelchook's death, the Lelchooks must establish "two similar but distinct

elements": first, that Syria's provision of material support or resources to Hezbollah was "a

'substantial factor' in the sequence of events that led to" the extrajudicial killing; and second,

that David Lelchook's death was "'reasonably foreseeable or anticipated as a natural

consequence' of the defendant's conduct."  *Owens II*, 864 F.3d at 794 (quoting *Rothstein v. UBS*,

708 F.3d 82, 91 (2d Cir. 2013)); *see also Fritz*, 320 F. Supp. 3d at 85.  The Lelchooks have met

that standard.

First, Mr. Schenker's expert opinion provides satisfactory evidence that Syria's provision

of weapons to Hezbollah was a "substantial factor" in the events that led to the extrajudicial

killing of David Lelchook.  Mr. Schenker concludes that Hezbollah used Syrian rockets and

missiles and Iranian weapons transshipped through Syria during the 2006 war with Israel.  *See*

Schenker Decl. at 5–9.  Indeed, senior Hezbollah officials admitted that Syria exported weapons

to Hezbolllah during that war.  *See id.* at 4.  Iranian officials also have acknowledged Syria's role

in arming Hezbollah; in a 2016 interview, Iran's Beirut-based Chief of Staff armed forces, Major

General Mohammad Bagheri, stated that Hezbollah used Iranian-made missiles manufactured in

Syria during the war with Israel.  *Id.* at 8.

The types of rockets that Hezbollah fired at Israel during the 2006 war also are closely

tied to Syria.  The Assad regime supplied Hezbollah with "shorter-range lower tech rockets," and

Hezbollah heavily used shorter-range rockets during the war.  *See id.* at 8–9 (comparing

Hezbollah's significant use of short range rockets with the relatively lower number of longer-

range Iranian missiles that Hezbollah fired into Israel during this time).  During the summer 2006

19

war, Hezbollah had nearly 10,000 of the Katyusha or 122 mm Grad shorter range rockets, and

Hezbollah fired approximately 3,500 Katyusha rockets into Israel during the 2006 war. *Id.*

Although the origin of Hezbollah's Katyushas varied, "according to . . . Uzi Rabin — Israel's

foremost expert in missiles and rockets — the provenence [sic] of Hezbollah's arsenal of

Katyushas was Syria." Schenker Decl. at 9; FED. R. EVID. 807(a).

      Given Syria's role as a conduit for Iranian weapons to reach Hezbollah and Syria's direct

provision of weapons to Hezbollah, Mr. Schenker concludes that "there is no doubt that the

Katyusha that hit Kibbutz Saar that day passed through Syria." Schenker Decl. at 9 (drawing

conclusion from information from Israeli intelligence officials that a Syrian sourced rocket was

responsible for David Lelchook's death on August 2, 2006). Even if the Katyusha missile that

killed David Lelchook cannot be directly traced to Syria, the fact that Syria directly provided

rockets and missiles to Hezbollah and participated in the shipment of Iranian weapons to

Hezbollah, paired with the fact that Hezbollah used such weapons to attack Israel during the

2006 war, provides ample evidence to establish that Syria's actions were a substantial factor in

the events that led to David Lelchook's death. *See generally Roth v. Syrian Arab Republic*, 2018

WL 4680270 at *8 (D.D.C. Sept. 28, 2018) (concluding that evidence that Syria provided

material support to Hamas including weapons and training and encouraged terrorist activities

against Israeli targets was "sufficient for the relatively low proximate cause bar imposed by the

FSIA").

      Turning to the second element, David Lelchook's death clearly was a reasonably

foreseeable consequence of Syria's material support of Hezbollah. *See Owens II*, 864 F.3d at

794. Hezbollah was created by Iran "as a proxy militia primarily focused on fighting Israel" and

"frequently attack[s] Israel." Schenker Decl. at 5. Consequently, it was reasonably foreseeable

that Hezbollah would attack Israel, and that it would use the military materiel provided from and via Syria to do so.  Given that Syria transferred weapons to Hezbollah during the war, it was foreseeable that those weapons would be used to attack Israeli targets during the 2006 war.  *See* Schenker Decl. at 6; *see also Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 136 (D.D.C. 2018) (finding a terrorist incident reasonably foreseeable based on a state's motive and conduct in providing material support to a terrorist organization); *Ben-Rafael*, 540 F. Supp. 2d at 53–54 (concluding that it was reasonably foreseeable that innocent people would be killed as a result of terrorist attack); *Estate of Doe v. Islamic Republic of Iran*, 808 F. Supp. 2d 1, 16 (D.D.C. 2011) (same).

In sum, the Lelchooks have provided satisfactory evidence to establish that a "reasonable connection" existed "between the material support provided and the ultimate act of terrorism." *Foley*, 249 F. Supp. 3d at 204 (quoting *Owens*, 826 F. Supp. 2d at 151) (internal quotation marks omitted).  Accordingly, they have demonstrated that Syria's material support of Hezbollah was a proximate cause of David Lelchook's death.  *See Ben-Rafael*, 540 F. Supp. 2d at 53–54 (concluding that the proximate cause test was "easily met" where foreign state provided "money, training and technical expertise" to Hezbollah, and Hezbollah subsequently carried out a terrorist attack and bombed an embassy); *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 325 (D.D.C. 2014) (concluding that facts showing Iran's material support for and Hezbollah's subsequent actions "more than demonstrate the kind of reasonable connection required for a waiver of foreign sovereign immunity" under the FSIA).

\* \* \* \* \*

As explained above, the Lelchooks have provided satisfactory evidence to establish subject matter jurisdiction under the FSIA's terrorism exception. Accordingly, the undersigned

recommends that the Court find that it has subject matter jurisdiction to review the Lelchooks'

claims.

### III.      Personal Jurisdiction

The Court must next determine whether it may exercise personal jurisdiction over Syria

in this matter.  In FSIA cases, a plaintiff must serve a defendant pursuant to 28 U.S.C. § 1608 to

give the Court personal jurisdiction over that defendant.  *See* 28 U.S.C. § 1330(b); *see also*

*Azadeh v. Government of Islamic Republic of Iran*, 318 F. Supp. 3d 90, 97 (D.D.C. 2018) ("[I]f a

federal court has subject-matter jurisdiction over a given case, it need only assure itself that the

plaintiff has properly served the foreign state in accordance with section 1608(a) in order to

exercise personal jurisdiction over the foreign state."); *Fritz*, 320 F. Supp. 3d 48 at 87 (quoting

*Barot v. Embassy of the Republic of Zam.*, 785 F.3d 26, 27 (D.C. Cir. 2015)).  Section 1608(a)

identifies four methods of service, each of which is a subsequent alternate to the prior method

listed:

> (1)     by delivery of a copy of the summons and complaint in
> accordance with any special arrangement for service
> between the plaintiff and the foreign state or political
> subdivision; or
>
> (2)     if no special arrangement exists, by delivery of a copy of the
> summons and complaint in accordance with an applicable
> international convention on service of judicial documents; or
>
> (3)     if service cannot be made under paragraphs (1) or (2), by
> sending a copy of the summons and complaint and a notice
> of suit, together with a translation of each into the official
> language of the foreign state, by any form of mail requiring
> a signed receipt, to be addressed and dispatched by the clerk
> of the court to the head of the ministry of foreign affairs of
> the foreign state concerned, or
>
> (4)     if service cannot be made within 30 days under paragraph
> (3), by sending two copies of the summons and complaint
> and a notice of suit, together with a translation of each into
> the official language of the foreign state, by any form of mail

requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services--and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).

As a plaintiff "must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on," the Court will review each method of service in turn. *Azadeh*, 318 F. Supp. 3d at 97. The Lelchooks could not serve Syria pursuant to Section 1608(a)(1), because no special arrangement exists between the Lelchooks and Syria. *See* Decl. in Supp. of Default ¶ 3, ECF No. 14 (stating that "no 'special arrangement' exists with regard to any of the plaintiffs and the defendant"). Service could not be effected under Section 1608(a)(2), because no international convention on the service of documents exists with respect to Syria. *See* Pl.'s Mem. at 4; *Braun*, 228 F. Supp. 3d at 78 (noting that Syria and other foreign state defendants had not entered into an international convention on service and thus could not be served under Section 1608(a)(2)); *Thuneibat*, 167 F. Supp. 3d at 37–38 (reaching same conclusion). Turning to Section 1608(a)(3), although the Lelchooks attempted to effect service by mail, the mail carrier, DHL, advised them that delivery had been refused. *See* Aff. Requesting Foreign Mailing at 1, ECF No. 8.

The Lelchooks then attempted and accomplished service under Section 1608(a)(4). *See id.*; Return of Serv./Aff., ECF No. 13. On December 23, 2016, in accordance with the statutory requirements, the Clerk of Court sent "[t]wo copies of the summons, complaint, and notice of suit," along with "a translation of each into the official language of the foreign state" to the U.S. Department of State ("State Department"). Certificate of Mailing, ECF No. 10. Due to the

suspension of diplomatic channels between the United States and Syria, the State Department transmitted the documents to the U.S. Embassy in Prague, for transmission via the Embassy of the Czech Republic in Syria. *See* Pls.' Status Report ¶ 6 & Ex. A, ECF No. 11-1 (Letter from Michael McPherson, Paralegal Specialist, Office of Legal Affairs, Overseas Citizen Services, State Department, providing a status update). On May 29, 2017, the Embassy of the Czech Republic delivered the documents to the Syrian Ministry of Foreign Affairs. *See* Return of Serv./Aff. at 7, ECF No. 13. On September 13, 2017, the Plaintiffs filed with the Clerk of Court a certified copy of the diplomatic note used to transmit the papers to the Syrian government, which included the date on which the papers were transmitted. *See id.*

Given that the Lelchooks served Syria through diplomatic channels, in accordance with 28 U.S.C. § 1608(4), the undersigned recommends that the Court find that it has personal jurisdiction over Syria in this matter. *See* 28 U.S.C. § 1330(b).

## IV.    Plaintiffs' Eligibility to Bring a Section 1605A Claim Against Syria

The Court next considers whether the Lelchooks have a federal private right of action to pursue their claims against Syria. 28 U.S.C. §1605A[6] provides a private right of action against a "foreign state that is or was a state sponsor of terrorism" for personal injury or death caused by, *inter alia*, an extrajudicial killing or the state's provision of material support for such an act. 28 U.S.C. §§ 1605A(a)(1), (c). That private right of action is available to the following categories of claimants:

---

[6]  In January 2008, 28 U.S.C. § 1605A replaced the prior FSIA terrorism exception, 28 U.S.C. § 1605(a)(7), that was repealed under the National Defense Authorization Act for Fiscal Year 2008. *See* Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-44 (2008). However, the D.C. Circuit has found that Section 1605A applies retroactively to conduct that predated its adoption. *See Owens II*, 864 F.3d at 815 ("The 2008 NDAA plainly applies the new cause of action in § 1605A(c) to the pre-enactment conduct of a foreign sovereign."). Accordingly, although David Lelchook was killed in 2006, the Lelchooks may pursue their claims under Section 1605A.

(1)    a national of the United States,

(2)    a member of the armed forces,

(3)    an employee of the Government of the United States, or of an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment, or

(4)    the legal representative of a person described in paragraph (1), (2), or (3), . . .

28 U.S.C. § 1605A(c).

The foregoing jurisdictional analysis addressed the existence of an extrajudicial killing and Syria's material support for Hezbollah's terrorist activities. Accordingly, the Court need only determine whether the five plaintiffs in this matter — Doris Lelchook, Alexander Lelchook, Michal Lelchook, Yael Lelchook, and Ester Lelchook[7] in her capacity as the personal representative of the estate of David Lelchook[8] — fall within one of the enumerated categories in Section 1605A(c).

Doris Lelchook, Alexander Lelchook, Michal Lelchook, and Yael Lelchook have established by evidence satisfactory to the Court that, as United States nationals, they have a private right of action under the FSIA. *See* Pls.' Suppl. Filing of Evid. in Supp. of Pls.' Mot. for Default J. ("Pls.' Suppl."), Ex. B, ECF 20-2 (U.S. birth certificate of Doris Lelchook (née Klein)); Pls.' Suppl., Ex. A, ECF 20-1 (U.S. birth certificate of Alexander Lelchook); Pls.' Mot.,

---

[7] Ester Lelchook's name is spelled in several different ways throughout Plaintiffs' filings: Ester, Esther, Estera. *See* Pls.' Mot.; *id.*, Ex. E, ECF No. 17-6; Pls.' Suppl. Mem. at 5 & Exs. K, L, ECF Nos. 22-5 & 22-6. As explained in Plaintiffs' Supplemental Memorandum, the spelling variations occur as a result of the translation of Ms. Lelchook's name from Hebrew to English. *See* Pls.' Suppl. Mem. at 5; *id.*, Ex. L ¶ 6 (Declaration of Michael Kramskiy). This Report and Recommendation will utilize the spelling of "Ester," consistent with Plaintiffs' Motion.

[8] Although the Complaint also lists Ester Lelchook as a Plaintiff in her individual capacity, *see* Compl. ¶ 4, Plaintiffs have since clarified that Ester Lelchook appears before the court solely as the personal representative of the estate of David Lelchook. Pls.' Suppl. Mem. at 4 & Ex. K (Decl. of Estera Lelchook) ¶ 9.

Ex. C, ECF 17-4 (U.S. passport of Michal Lelchook); Pls.' Mot., Ex. D, ECF 17-5 (U.S. passport of Yael Lelchook).

Ester Lelchook also has a private right of action in her capacity as the representative of David Lelchook's estate. *See* 28 U.S.C. § 1605A(c)(4). Ester Lelchook asserts a claim of wrongful death on behalf of David Lelchook's estate. *See* Compl. ¶¶ 4, 23–29; Pls.' Mem. at 8–10. To determine whether the FSIA permits her to raise such a claim, the Court must first determine whether the Estate, as plaintiff, has standing to assert its claims in this action. *See Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 12 (D.D.C. 2011). As a "threshold question concerning the power of the estate to bring and maintain legal claims," this inquiry is "governed by the law of the state which also governs the creation of the estate." *Id.*; *see also Worley*, 75 F. Supp. 3d at 333; *Cohen*, 238 F. Supp. 3d at 85.

David Lelchook's estate exists under Israeli law, and the Court must look to Israeli law to determine whether the Estate has standing to raise wrongful death claims. *See* Pl.'s Mot., Ex. E ("Inheritance Order"), ECF No. 17-6 (Inheritance Order issued by the State of Israel "[b]efore the Inheritance Registrar in Haifa"); Pl.'s Mem. at 9; *see also Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 398 (D.D.C. 2015) (relying on an Inheritance Order to show that the "estate exists in Israel"). Israeli law provides that "on the death of any person, all causes of action in respect of any civil wrong subsisting against or vested in him shall survive against or, as the case may be, for the benefit of, his estate." Gabbay Decl. ¶ 6(a) n.1 (quoting Civil Wrongs Ordinance (New Version) § 19, 5728-1968, 2 LSI (New Version) 5 (1972) as amended (Isr.)) (internal quotation marks omitted); *see* FED. R. CIV. P. 44.1. In addition, under Israeli law, Certificates of Inheritance establish the heirs that may bring any claims on behalf of an estate. Gabbay Decl. ¶¶ 7, 9–10. Ester Lelchook is the sole heir of David Lelchook's estate, and accordingly, is the

proper legal representative who may pursue claims on behalf of the Estate.  *See* Inheritance

Order; Gabbay Decl. ¶¶ 10–11.  As David Lelchook was a United States national, *see supra* Part

II.B., Ester Lelchook has a private right of action under the FSIA in her capacity as the

representative of David Lelchook's estate.  *See* 28 U.S.C. § 1605A(c)(4) (allowing claims to be

brought by legal representative of a U.S. national).

## V.     Whether the Lelchooks Have Presented Satisfactory Evidence to Establish Liability

A viable claim under 28 U.S.C. § 1605A has five elements and permits a foreign state to

be held liable for: "(1) an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or

provision of material support or resources for such an act where (2) the act was committed, or the

provision provided, by the foreign state or agent of the foreign state, and the act (3) 'caused' (4)

'personal injury or death' (5) for which the courts of the United States may maintain jurisdiction

under [Section 1605A] for monetary damages."  *Flanagan v. Islamic Republic of Iran*, 87 F.

Supp. 3d 93, 115 (D.D.C. 2015) (quoting *Budoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93,

101 (D.D.C. 2012) (quoting 28 U.S.C. §§ 1605A(1), (c))).  The third and fourth elements require

a plaintiff to "prove a theory of liability under which defendants cause the requisite injury or

death."  *Flanagan*, 87 F. Supp. 3d at 115; (citing *Valore v. Islamic Republic of Iran*, 700 F. Supp.

2d 52, 73 (D.D.C. 2010)).

Section 1605A does not itself provide the substantive theories of liability on which a

FSIA plaintiff may base his or her claims.  *See id.*; *Braun*, 228 F. Supp. 3d at 78; *Valore*, 700 F.

Supp. 2d at 76.  Nor does the law permit courts to create a body of federal common law to

govern liability for Section 1605A claims.  *See Roth*, 78 F. Supp. 3d at 399; *Estate of Hirshfeld*

*v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 137–38 (D.D.C. 2018).  Consequently, courts

have applied "general principles of tort law, such as the RESTATEMENT (SECOND) OF

TORTS, to determine liability."  *Braun*, 228 F. Supp. 3d at 78 (quoting *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009)) (internal quotation marks omitted); *see also Estate of Hirshfeld*, 330 F. Supp. 3d at 137–38; *Worley*, 75 F. Supp. 3d at 335 (noting that courts rely on the Restatement "and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions" (quoting *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012)) (internal quotation marks omitted)); *In re Islamic Repub. of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009).

The Lelchooks seek to hold Syria liable for "extrajudicial killing, wrongful death, intentional infliction of emotional distress, and solatium."  Pls.' Mem. at 2.  An extrajudicial killing provides a means of establishing the first necessary element of a Section 1605A claim but is not itself a theory of liability.  *See generally Braun*, 228 F. Supp. 3d at 78.  Consequently, the undersigned will interpret the Lelchooks' complaint and motion as presenting wrongful death, intentional infliction of emotional distress (IIED), and solatium as the theories of liability underlying their Section 1605A claim.  The undersigned already has determined that David Lelchook's death was an extrajudicial killing resulting from Hezbollah's bombing of Israel, that Syria provided material support for that act, and that the Court has jurisdiction to review the claims arising from those acts.  *See supra* Part II.C.  As those findings satisfy the first, second, and fifth elements of a 1605A claim, the following analysis evaluates the theories of liability (wrongful death, IIED and solatium) presented to satisfy the third and fourth elements.

A. <u>**Wrongful Death**</u>

Plaintiffs Ester Lelchook (on behalf of the Estate of David Lelchook), Doris Lelchook, Alexander Lelchook, Michal Lelchook, and Yael Lelchook, assert a claim for wrongful death under Section 1605A.  "[A] decedent's heirs at law, through the decedent's estate, may bring a

wrongful death action under section 1605A(c) 'for economic losses which result from a decedent's premature death.'" *Roth*, 78 F. Supp. 3d at 400 (quoting *Valore*, 700 F. Supp. 2d at 78); *see also Worley*, 75 F. Supp. 3d at 335; *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 74 (D.D.C. 2010); *Beer*, 2010 WL 5105174, at *13 (noting also that "this Court has begun to articulate some general rules concerning actions for wrongful death under § 1605A"). Accordingly, consistent with this rule, only the Estate of David Lelchook may pursue a wrongful death theory of liability under section 1605A.

The Estate of David Lelchook may recover for the decedent's wrongful death provided that it demonstrates that Syria caused that death. *See Thuneibat*, 167 F. Supp. 3d at 39 (citing RESTATEMENT (SECOND) OF TORTS § 925 (1965)) ("The Victims may recover for their wrongful deaths if they can establish the defendants caused their deaths."). As discussed *supra*, the record contains sufficient and satisfactory evidence to show that Syria, by providing material support or resources to Hezbollah, proximately caused the extrajudicial killing of David Lelchook. *See supra* Part II.C. Accordingly, the undersigned recommends that the Court deem Syria liable and subject to default judgment for the wrongful death claim brought by Ester Lelchook on behalf of the Estate of David Lelchook.

## B.    Intentional Infliction of Emotional Distress

Plaintiffs Doris Lelchook, Alexander Lelchook, Michal Lelchook, and Yael Lelchook assert a claim for intentional infliction of emotional distress ("IIED") arising out of the extrajudicial killing of David Lelchook.[9] *See* Compl. ¶ 32. Section 46 of the Restatement of

---

[9]    The Complaint also indicates that Ester Lelchook brings an IIED claim and suggests that the claim is brought in her personal capacity given the lack of a reference to the Estate. *See* Compl. ¶ 32. However, Plaintiffs have clarified that Ester Lelchook is before the Court "only as the legal heir and representative of the Estate of David Lelchook," Pls.' Suppl. Mem. at 4, thereby disavowing any personal capacity claims. *See* Pls.' Mem. at 9 n.4. Accordingly, the

Torts provides the standard that courts typically apply to IIED claims brought under 1605A(c).

Under that standard, a defendant is liable if "by extreme and outrageous conduct [the defendant]

intentionally or recklessly causes severe emotional distress."  RESTATEMENT (SECOND) OF TORTS

§ 46(1) (1965); *see also Valore*, 700 F. Supp. 2d at 76 (utilizing "the Restatement (Second) of

Torts as a proxy for state common law" (quoting *Estate of Heiser*, 659 F. Supp. 2d at 24)

(internal quotation marks omitted)); *cf. Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333

(D.C. Cir. 2003) (noting where the FSIA required application of non-state specific common law,

"federal courts in FSIA and Flatow Amendment cases have accepted § 46 of the Restatement

(Second) of Torts as a proxy for state common law of intentional infliction of emotional

distress").  Where, as here, "conduct is directed at a third person," *i.e.*, someone other than the

Plaintiffs, the Restatement provides that the defendant is liable

> if he intentionally or recklessly causes severe emotional distress
>
> (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
>
> (b) to any other person who is present at the time, if such distress results in bodily harm.

RESTATEMENT (SECOND) OF TORTS § 46(2).  However, given the uniqueness of terrorism, courts

have expanded the scope of IIED claims under Section 1605A to permit immediate family

members who were not present at the time of the underlying conduct to seek relief.  *See*

*Goldberg-Botvin v. Islamic Republic of Iran*, 938 F. Supp. 2d 1, 10 (D.D.C. 2013) (citing *Estate*

*of Heiser*, 659 F. Supp. 2d at 26–27).  Specifically, "members of a victim's immediate family"

may recover if "'the defendants' conduct is sufficiently outrageous and intended to inflict severe

emotional harm upon a person [who] is not present.'"  *Braun*, 228 F. Supp. 3d at 81 (quoting

*Estate of Heiser*, 659 F. Supp. 2d at 26–27); *see also Estate of Heiser*, 659 F. Supp. 2d at 27 ("If

---

undersigned considers the IIED claim only for the other four plaintiffs.

the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm

upon a person which is not present, no essential reason of logic or policy prevents liability."

(quoting Dan B. Dobbs, The Law of Torts § 307, at 834 (2000) (internal quotation marks

omitted))).

      In sum, Syria is liable under an IIED theory if it "(1) engaged in extreme and outrageous

conduct (2) which was directed at persons other than plaintiffs (3) which intentionally or

recklessly caused severe emotional distress, but not necessarily bodily harm, (4) to such persons'

immediate family members."  *Reed*, 845 F. Supp. 2d at 212 (footnote omitted).  Doris,

Alexander, Michal, and Yael Lelchook have presented evidence that satisfactorily proves each of

those four elements.

      First, by definition, "[a]ll acts of terrorism are . . . extreme and outrageous and intended

to cause the highest degree of emotional distress, literally, terror, in their targeted audience."

*Estate of Heiser*, 659 F. Supp. 2d at 27 (quoting *Stethem v. Islamic Republic of Iran*, 201 F.

Supp. 2d 78, 89 (D.D.C. 2002)) (internal quotation marks omitted).  In turn, Syria's provision of

material support and resources to Hezbollah, which perpetrated the bombing that caused the

death of David Lelchook, also constitutes extreme and outrageous conduct.  *See supra* Part

II.C.2; *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 343 (D.D.C. 2016) ("[T]he act of

engaging in terrorism by means of material support . . . is extreme, outrageous, and goes beyond

all possible bounds of decency." (quoting *Levin v. Islamic Republic of Iran*, 529 F. Supp. 2d 1,

17 (D.D.C. 2007)) (internal quotation marks omitted)); *see also Braun*, 228 F. Supp. 3d at 81

("The defendants' conduct in providing material support and resources to a known terrorist

organization is extreme and outrageous."); *Beer v. Islamic Republic of Iran*, 574 F. Supp. 2d 1,

12 (D.D.C. 2008).  Moreover, materially supporting a known terrorist organization is

"sufficiently outrageous and intended to inflict severe emotional harm upon a person who is not present," to permit family members who were not present at the attack to bring an IIED claim. *Thuneibat*, 167 F. Supp. 3d at 40 (quoting *Estate of Heiser*, 659 F. Supp. 2d at 27).

Second, the harm was directed at an individual other than Doris, Alexander, Michal, and Yael Lelchook.  David Lelchook was killed as a result of the missile strike on Kibbutz Saar.

Third, Doris, Alexander, Michal, and Yael Lelchook have established that they each suffered "severe emotional distress."  *Reed*, 845 F. Supp. 2d at 212; *see also Cohen*, 238 F. Supp. 3d at 84–85 (noting that "each family member must still establish the final element of an IIED claim, i.e. that [they] suffered severe emotional distress"); *but see Valore*, 700 F. Supp. 2d at 79 (finding the third element satisfied by the definition of terrorism itself).  Although "[s]evere distress must be proved; . . . in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed."  RESTATEMENT (SECOND) OF TORTS § 46 cmt. J; *see generally Stethem*, 201 F. Supp. 2d at 89 (finding that all acts of terror result in emotional distress and that "[t]he more extreme and outrageous [the act], the greater the resulting distress").  Severe emotional distress may include panic attacks, loss of sleep, anxiety, depression, inability to work, and the creation of new phobias.  *See Cohen*, 238 F. Supp. 3d at 84–86; *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 15 (D.D.C. 2009) (finding that plaintiff who was "filled with anxiety" after a bombing that caused his wife's death and endured years of subsequent group therapy suffered severe emotional distress).

Here, Doris, Alexander, Michal, and Yael Lelchook's affidavits provide satisfactory evidence that they each suffered severe emotional distress.  *See Worley*, 75 F. Supp. 3d at 337 (relying on "uncontroverted affidavit evidence" in finding that a plaintiff had established emotional distress for IIED liability); *see also Cohen*, 238 F. Supp. 3d at 85 (relying on evidence

including affidavits); *Wachsman ex rel. Wachsman v. Islamic Republic of Iran*, 603 F. Supp. 2d 148, 158–59 (D.D.C. 2009) (relying on declarations by plaintiffs to satisfy the showing of severe emotional distress).  All four plaintiffs assert that they have experienced "extraordinary grief, mental anguish, and emotional distress" that continues to affect them to this day.  Pl.'s Suppl. Mem., Ex. G ("Michal Lelchook Decl.") ¶ 4, ECF No. 22-1; *id.*, Ex. H ("Yael Lelchook Decl.") ¶ 4, ECF No. 22-2; *id.*, Ex. I ("Doris Lelchook Decl.") ¶ 6, ECF No. 22-3; *id.*, Ex. J ("Alexander Lelchook Decl.") ¶ 6, ECF No. 22-4.

Specifically, Michal Lelchook notes that she required "mental health counseling from a psychiatrist," but that she was unable to continue with it because the issue was too difficult to discuss.  Michal Lelchook Decl. ¶ 5.  Since the death of her father, she has found it "difficult to engage in everyday activities," and her "extreme distress and anger has made it difficult at times for [her] to carry out the daily functions of [her] life."  *Id.*  In addition, she has been unable to pursue a career and has had difficulty holding down employment.  *Id.*

Likewise, Yael Lelchook states that following the death of her father, she required mental health counseling for three and a half years.  *See* Yael Lelchook Decl. ¶ 5.  Her father's death caused her to feel "withdrawn and alone, and for a time it created a difficult relationship" between herself, her mother, and her sister.  *Id.* ¶ 6.  Yael Lelchook experienced feelings of "guilt" and "rage," and sometimes "relaps[es] into periods of despair."  *Id.*

Similarly, Doris Lelchook states that she required mental health counseling following her son's death.  Doris Lelchook Decl. ¶ 6.  She has experienced physical changes and difficulty carrying out the "daily functions" of her life.  *Id.* ¶ 7.  In addition, she "still experience[s] anxiety and overwhelming sadness at times."  *Id.*

Finally, Alexander Lelchook states that the "extreme distress" suffered following his brother's death "has made it difficult at time . . . to carry out the daily functions of [his] life." Alexander Lelchook Decl. ¶ 6.  He describes "feelings of sadness" due to changes in family structure, including "losing the closeness of [his] youngest niece, who has never overcome her father's death."  *Id.*  He "experienced sleepless nights" following the death of his brother but has fewer such periods today. *Id.* ¶ 7.  He also experiences stress, loss, and emptiness.  *Id.*

Fourth and finally, Doris, Alexander, Michal, and Yael Lelchook have all shown that they are immediate family members of the victim, by submitting uncontroverted affidavits.  *See Roth*, 78 F. Supp. 3d at 401 (relying on uncontroverted affidavits in concluding that plaintiffs had proven their status as immediate family members).  In FSIA cases, "the 'immediate family' requirement is strictly construed . . . ; generally, only spouses, parents, siblings, and children are entitled to recover."  *Id.* at 400 (quoting *Murphy*, 740 F. Supp. 2d at 75).  Michal Lelchook and Yael Lelchook are David Lelchook's daughters.  *See* Inheritance Order.  Alexander Lelchook and Doris Lelchook are David Lelchook's brother and mother, respectively.  *See* Alexander Lelchook Decl. ¶ 3; Doris Lelchook Decl. ¶ 3.

For the foregoing reasons, the undersigned recommends that the Court enter default judgment on liability for the IIED claim brought by Doris Lelchook, Alexander Lelchook, Michal Lelchook, and Yael Lelchook.

## C.    Solatium

Doris Lelchook, Alexander Lelchook, Michal Lelchook, and Yael Lelchook also seek to hold Syria liable under a theory of solatium.  *See* Compl. at Count II.  However, to the extent that solatium is an actionable claim and not simply a measure of damages,[10] a solatium claim is

---

[10]   At least one member of this Court has declined to recognize solatium as a theory of

"nearly indistinguishable from a claim for IIED." *Flanagan*, 87 F. Supp. 3d at 115 (citing

*Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 26–27 (D.D.C. 2014)); *see also Valore*,

700 F. Supp. 2d at 85.  In general, a party may not use multiple theories of liability to pursue

relief for the same injury; as a result, plaintiffs "can only recover once for their claims of IIED

and solatium." *Flanagan*, 87 F. Supp. 3d at 116; *see also Estate of Hirshfeld*, 330 F. Supp. 3d at

138 (citing *Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C. Cir. 1976)); *Braun*, 228 F. Supp.

3d at 80 ("[R]ecovery for the same injury under more than one theory of liability is forbidden.").

Accordingly, given that Doris, Alexander, Michal, and Yael Lelchook have established liability

under an IIED theory, the undersigned will not evaluate the solatium claim as a theory of

liability; instead, that issue will be deferred until Plaintiffs seek damages.  *Cf. Worley*, 75 F.

Supp. 3d at 336 n.10 (applying IIED standard to claims "variously styled solatium and IIED"

given the overlap between those theories); *Flanagan*, 87 F. Supp. 3d at 115–16 (reviewing

claims based on solatium and IIED solely under the solatium theory of liability given the overlap

between those two claims and the availability of solatium damages).  *See generally Estate of

Hirshfeld*, 330 F. Supp. 3d at 140–41 & n.17 (considering IIED and solatium as a single claim

and applying IIED law to establish liability).

## RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court grant-in-part and

deny-in-part Plaintiffs' Motion for Default Judgment Liability.  Specifically, the undersigned

recommends that the Court enter default judgment on liability for the wrongful death claim

brought by Ester Lelchook, in her capacity as the representative of the Estate of David Lelchook;

---

liability and instead viewed it solely as a means of recovering damages.  *See Reed*, 845 F. Supp.
2d at 213 n.5 ("The FSIA defines solatium as a measure of damages, however, not as an
independent cause of action.").

enter default judgment on liability for the IIED claim brought by Doris Lelchook, Alexander Lelchook, Michal Lelchook, and Yael Lelchook; and deny default judgment on the wrongful death claim brought by Doris Lelchook, Alexander Lelchook, Michal Lelchook, and Yael Lelchook.

## REVIEW BY THE DISTRICT COURT

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections.  The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985).


Dated:  January 31, 2019                              _____
                                                                             ROBIN M. MERIWEATHER
                                                                             UNITED STATES MAGISTRATE JUDGE