IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

LELCHOOK, et al.

            Plaintiffs,

  v.                              Civil Action No. 16-01550 (RC)(RMM)

SYRIAN ARAB REPUBLIC

            Defendant.
_____

**PLAINTIFFS' MEMORANDUM SETTING FORTH THEIR DAMAGES EVIDENCE**

**INTRODUCTION**

On March 25, 2019, this Court entered a default judgment as to the liability of the Defendant, the Syrian Arab Republic ("SYRIA"), for its material support of the terrorist organization Hezbollah in conducting the rocket attack that killed David Lelchook on August 2, 2006 "(Terrorist Rocket Attack"). (D.E. 25). Plaintiffs brought their claims pursuant to the Foreign Sovereign Immunities Act's ("FSIA") terrorism exception. In its Order, the Court found that the Defendant Syria was liable to the Estate of David Lelchook for the wrongful death of David Lelchook as it was an extrajudicial killing and that the Defendant Syria was liable to David Lelchook's immediate family members, Michal Lelchook, Yael Lelchook Galili, Alexander Lelchook, and the Estate of Doris Lelchook[1] for their IIED claims because Syria's material support of terrorism was extreme and outrageous conduct and caused each family member severe emotional distress. (D.E. 25 at 4).

---

[1] The Court's March 25, 2019 Order also granted Plaintiffs' Motion to substitute Alexander Lelchook as the executor of the Estate of Doris Lelchook for Plaintiff, Doris Lelchook. (D.E. 25 at 3).

On April 8, 2019, this Court entered a Minute Order instructing the Plaintiffs to submit their damages evidence on or before July 15, 2019.  Accordingly, Plaintiffs now provide the Court with damages evidence on behalf of (1) Ester Lelchook, the wife of the decedent, David Lelchook as the representative of the Estate of David Lelchook; (2) Michal Lelchook, daughter of David Lelchook; (3) Yael Lelchook Galili, daughter of David Lelchook; (4) Alexander Lelchook, brother of David Lelchook; and (5) Alexander Lelchook as the representative of the Estate of Doris Lelchook, mother of David Lelchook.

The Plaintiffs are each entitled to damages against Syria because (1) they are the representative of the Estate of the decedent, David Lelchook, or (2) they are, or they are the appointed representative of, an immediate family member of David Lelchook.  In addition, each of them is entitled to an award of punitive damages against Syria, under 28 U.S.C. § 1605A(c), for its sponsorship of Hezbollah and this heinous act of murder.

## I. ECONOMIC DAMAGES

### A. WRONGFUL DEATH

#### i. The Estate of David Lelchook

Ester Lelchook, as the representative of the Estate of David Lelchook, is entitled to an award for damages for this Court's finding of liability for the wrongful death of David Lelchook.  In FSIA cases, courts in this District have awarded damages for wrongful death consistent with the District of Columbia's wrongful death statute. *See Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 58 (D.D.C. 2008); *see also* D.C. Code Ann. § 16-2701 (2001).  This statute "authorizes a personal representative of the deceased to claim damages measured as the economic loss caused by the death of a person wrongfully killed." *Id.  citing Bodoff v. Islamic Republic of Iran,* 424 F.Supp.2d 74, 85 (D.D.C.2006)(internal citations removed).

Evidence of economic loss sustained by David Lelchook's spouse is set forth in the expert report of The Center for Forensic Economic Studies compiled by Dr. Chad Staller.  *See* Expert Report from the Center for Forensic Studies for the Estate of David Lelchook attached hereto as Exhibit A.  Dr. Staller is an expert in the field of forensic economics.   Dr. Staller's experience and expertise in the field of forensic economics is detailed in his curriculum vitae.  *See* Curriculum Vitae of Dr. Chad Staller attached to Staller Expert Report as Exhibit A, Appendix A, p. 2-8. Dr. Staller has testified in approximately 230 state and federal cases nationwide.  *See* Testimony List for Chad L. Staller attached as Exhibit A, Appendix A, p. 9-14.  His testimony has been accepted by U.S. district and appellate courts as well as in state circuit, appellate and supreme courts.

In his report, Dr. Staller reviews the methodology of calculation of economic loss. Ex. A. Dr. Staller takes into account Mr. Lelchook's earning history and projected earnings, Ex. A, p.2. He also considers the worklife expectancy for a male living in Israel.  *Id*. Dr. Staller also takes into account personal maintenance expenditures for David Lelchook.  Ex. A, p.3.   As Dr. Staller explains, because the kibbutz where Mr. Lelchook and his family lived paid for the maintenance expenses of the Lelchook family, until the kibbutz was privatized on December 31, 2008, personal maintenance was not included in his calculations for the period prior to January 1, 2009.  *Id.* Dr. Staller accounts for lost pension benefits and the lost value of Mr. Lelchook's household services. Ex. A, p.4.  Finally, Dr. Staller adjusts his calculation to net present value in recognition that a lump sum will be awarded in the present year.  Ex. A, p.5.  Based on this methodology and these calculations, Dr. Staller concludes, in his expert opinion, that assuming David Lelchook lived the remainder of his life and was employed in Israel in accordance with the worklife expectancy for a male living in Israel, the total economic loss is equal to ▮▮▮▮▮▮▮ (NIS)[2] which converts to

---

[2] New Israeli Shekel

████ at present dollar-shekel conversion rates, net of personal maintenance not supported by the kibbutz, as reflected in Tables 1-3, and Summary Table attached to his Report. Ex. A, p.7.

Accordingly, pursuant to FRE 702, the Court should find Dr. Staller's report admissible expert opinion, reliable and a proper basis for awarding economic damages as discussed therein, and in such amounts as the Court may determine to be just and proper under the circumstances to be awarded to Ester Lelchook, as the representative of the Estate of David Lelchook.

### B.   INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

IIED claims are indistinguishable from solatium claims. *See Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 140–41 (D.D.C. 2018) *citing Valore*, 700 F.Supp.2d at 85 (citation omitted); *see also Surette v. Islamic Republic of Iran*, 231 F.Supp.2d 260, 269 n.8 (D.D.C. 2002) ("[i]n an intentional homicide case such as [a terrorist killing], solatium appears in any event to be indistinguishable from the intentional infliction of emotional distress for which the District of Columbia does generally allow recovery in tort") (internal quotation marks omitted). Courts can therefore look to cases analyzing either type of claim for guidance on the other. *See Estate of Hirshfeld*, 330 F. Supp. 3d, 140-41.

The standard for an IIED claim draws heavily upon principles set forth in the Restatement (Second) of Torts whereby defendants are liable for IIED if they "by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress" to the plaintiffs. *Id*. *citing* Restatement (Second) of Torts § 46(1). The Restatement permits recovery not only by persons who are the recipients of the "extreme and outrageous conduct," but also by: (1) members of the victim's immediate family (2) who were present at the time of the extreme and outrageous conduct. *Id*. *citing Murphy v. Islamic Republic of Iran*, 740 F.Supp.2d 51, 75 (D.D.C. 2010).

In situations where the victim was killed as opposed to being injured, factors considered by courts for IIED claims include: "(1) whether the decedent's death was sudden and unexpected; (2) whether the death was attributable to negligence or malice; (3) whether the claimants have sought medical treatment for depression and related disorders resulting from the decedent's death; (4) the nature (i.e., the closeness) of the relationship between the claimant and the decedent; and (5) the duration of the claimants' mental anguish in excess of that which would have been experienced following the decedent's natural death." *Id. citing Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89-90 (D.D.C. 2002). Courts put emphasis on the cause of death in terrorism cases, when considering that "the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time." *Id. citing Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 111 (D.D.C. 2000).

Even with these guideposts, claims for solatium, unlike those for lost wages, are difficult to quantify, and not readily susceptible to "models and variables." *Id.* (citations omitted), *see also Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 111 (D.D.C. 2000). In cases where solatium damages are sought, most courts employ the damages model articulated in *Estate of Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229 (D.D.C. 2006) ("*Heiser I*"). The damages framework set out in *Heiser I* anticipated awards of $5 million for parents and children of deceased victims, and $2.5 million for siblings. *See Estate of Hirshfeld*, 330 F. Supp. 3d at 147.

However, the numbers set forth under the *Heiser I* damages framework are "not set in stone." *Murphy,* 740 F.Supp.2d at 79. Aggravating circumstances allow the Court considerable discretion to increase a plaintiff's damages by substantial amounts. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (solatium damages increased by 25% due to

5

aggravating circumstances); *see also Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006) (solatium damages increased by $1 million due to aggravating circumstances). Courts have discretion to deviate from the *Heiser* framework and may enhance the award depending on factors such as an especially close relationship between the plaintiff and the decedent, the circumstances surrounding the terrorist attack which made it particularly agonizing, and proof of a claimant's severe pain, grief or suffering. *See Oveissi v. Islamic Republic of Iran*, 768 F.Supp.2d 16, 26-27 (D.D.C. 2011). As set forth below, and confirmed by Plaintiffs' expert Dr. Rael Strous, there are aggravating circumstances in this case which justify an upward departure from the conventional baseline in the IIED damages calculation for each of the claims of the daughters, brother and mother of David Lelchook. Plaintiffs provide evidence of the extreme emotional toll sustained by David Lelchook's immediate family members by submitting the expert declaration of Dr. Rael Strous, an expert in the field of psychiatry. *See* Expert Declaration of Dr. Rael Strous, attached hereto as Exhibit B ("Strous Declaration"). Dr. Strous' experience and expertise in the field of psychiatry is detailed in his curriculum vitae. *See* Strous Declaration, Exhibit B-1. He is a U.S. board certified psychiatrist. *See* Strous Declaration ¶4. He specializes in the field of chronic post-traumatic stress disorder (PTSD).*See* Strous Declaration ¶7. Dr. Strous has testified in multiple federal cases nationwide and has also submitted court mandated psychiatric evaluations in Israel. *See* Strous Declaration ¶8. His testimony has been accepted by U.S. district and appellate courts as well as in state circuit, appellate and supreme courts. *See id*.

Accordingly, pursuant to FRE 702, the Court should find Dr. Strous' report admissible expert opinion, reliable and as further support for Plaintiffs' claims of intentional infliction of emotional distress.

    i. <u>Michal Lelchook</u>

In the present case, David Lelchook's daughter, Michal Lelchook, experienced and continues to experience severe and unconscionable mental anguish, bereavement, and unbearable grief as a result of her father's heinous murder and tragic death, and her corresponding loss of his society and comfort. In her Declaration, which the Plaintiffs attach hereto as Exhibit C and incorporate herein by reference, are details of Michal's anguish and continued grief.  In her Declaration, Michal avers that as a result of the Terrorist Rocket Attack which killed her father, she suffered significant and extraordinary grief, mental anguish, and emotional distress and that these injuries continue to affect her to this day.  *See* Ex. C, ¶4.  Michal explains that she and her father were extremely close.  *See id.*  Michal explains that on the day of her father's murder, she was in the United States working.  *See* Ex. C, ¶ 5.  When she received the news from her mother, she was alone and had to travel back to Israel alone.  *See id.*

Following her father's funeral Michal felt disoriented and in shock.  *See* Ex. C, ¶6.  Her return to Israel was further traumatizing because the home she had grown up in was destroyed by the same barrage of rocket attacks and was deemed uninhabitable.  *See* Ex. C, ¶7.  Therefore, she had no physical or emotional home to return to, and did not feel that she could return to her job in the United States.  *See Id.*  Her pain and loss have caused her to become directionless in life. *See* Ex. C, ¶8.

After her father's murder Michal received some mental health counseling, but it was difficult for her to continue because it was too painful for her.  *See* Ex. C, ¶9.  She also sought alternative counseling and therapy including acupuncture, spiritual healing, nature therapy, kinesiotherapy, reflexology, and other healing forms.  *See* id. Michal has found it difficult to engage in everyday activities.  *See* Ex. C, ¶10.  She has been unable to pursue a career and has had difficulty holding down employment.  *See id.*  Prior to her father's murder she was able to live on

7

her own and travel. *See id*. Now she feels unable to do so. *See id*. She finds it difficult to participate in social interactions, and experiences feelings of isolation and inferiority which causes her to withdraw from social situations. *See* Ex. C, ¶11. She experiences sudden overwhelming feelings of pain and sadness; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See id*. Even today, she remains hypersensitive to noises and loud explosions, both of which trigger flashbacks to the time of her father's murder. *See* Ex. C, ¶12. She also witnessed the suffering that her father's death brought her uncle, Alexander Lelchook, and her grandmother, Doris Lelchook, when she was alive. *See* Ex. C, ¶13.

Michal was interviewed in person and assessed by Dr. Rael Strous. Dr. Strous concludes that as a result of the terrorist attack which killed her father, Michal suffers from some form of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ either currently or in the past. *See* Strous Declaration, ¶ 20. Dr. Strous concludes that many of Michal's symptoms with which she has been diagnosed are likely to be present in varying degrees for a significant time to come and while it is impossible to state for any absolute certainty, he concludes that many of the symptoms may even be permanent. *See* Strous Declaration, ¶ 21. In support of his conclusions, Dr. Strous attaches to his Expert Declaration his detailed evaluation of Michal Lelchook. *See* Strous Declaration, Exhibit B. The summary of his evaluation concludes,



*See* Strous Declaration, Exhibit B-3, p 9.

Dr. Strous' prognosis for Michal Lelchook is as follows,



(emphasis added)

*See* Strous Declaration, Exhibit B-3, p 9.

Consequently, Michal Lelchook should receive a baseline IIED damages award of $5 million dollars and such significant upward adjustment as the Court deems fair, just and proper for the unbearable loss which Michal has suffered as a result of her father's murder.

        ii.   <u>Yael Lelchook Galili</u>

David Lelchook's older daughter, Yael Lelchook Galili, also experienced and continues to experience severe and unconscionable mental anguish, bereavement, and unbearable grief as a result of her father's heinous murder and tragic death, and her corresponding loss of his society and comfort. In her Declaration, which the Plaintiffs attach hereto as Exhibit D and incorporate herein by reference, are details of Yael's anguish and continued grief.  In her Declaration, Yael avers that as a result of the Terrorist Rocket Attack which killed her father, she suffered significant and extraordinary grief, mental anguish, and emotional distress and that these injuries continue to affect her to this day. *See* Ex. D, ¶4.  Yael explains that she and her father were extremely close. *See id.* She describes that upon seeing the body bag with my father on the news, she immediately started to scream. *See id.*  She describes that much of the activity surrounding her father's death remains a blur to her because of the shock and distress.  *See id.*

Following her father's murder, Yael received mental health counseling and therapy.  *See* Ex. D, ¶5. Yael explains that the murder of her father caused her to feel very withdrawn and alone.

9

*See* Ex. D, ¶6. She was unable to sleep or speak about her pain. *See id.* She abandoned school, friends, and work and was unable to leave her house except to walk her dog. *See id.* She has experienced nightmares, and was unable to sleep through the night. *See* Ex. D, ¶7. She was unable to maintain close relationships for fear of losing something or someone else that she loved. *See* Ex. D, ¶8. She has experienced overwhelming anger and fear causing her to be chronically angry. *See id.*

To this day, Yael cannot speak about her father without bodily responses including crying, tensing up, and shaking. *See* Ex. D, ¶9. Her father's murder has also caused Yael to have a difficult relationship with her mother and sister. *See* Ex. D, ¶10. She also witnessed the suffering that her father's death brought her uncle, Alexander Lelchook, and her grandmother, Doris Lelchook, when she was alive. *See* Ex. D, ¶11.

Yael was interviewed in person and assessed by Dr. Rael Strous. Dr. Strous concludes that as a result of the terrorist attack which killed her father, Yael suffers from some form of ▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊ either currently or in the past. *See* Strous Declaration, Ex. B, ¶ 18. Dr. Strous concludes that many of Yael's symptoms with which she has been diagnosed are likely to be present in varying degrees for a significant time to come and while it is impossible to state for any absolute certainty, he concludes that many of the symptoms may even be permanent. *See* Strous Declaration, Ex. B., ¶ 19. In support of his conclusions, Dr. Strous attaches to his Expert Declaration his detailed evaluation of Yael Lelchook. *See* Strous Declaration, Exhibit B. The summary of his evaluation concludes,





Strous Declaration, Exhibit B-2, p 9-10.

Dr. Strous' prognosis for Yael Lelchook Galili is as follows,

(emphasis added)

Strous Declaration, Exhibit B-2, p. 10.

Consequently, Yael should receive a baseline IIED damages award of $5 million dollars and such significant upward adjustment as the Court deems fair, just and proper for the unbearable loss which Yael has suffered as a result of her father's murder.

### iii. Alexander Lelchook

David Lelchook's brother, Alexander Lelchook, also experienced and continues to experience severe and unconscionable mental anguish, bereavement, and unbearable grief as a result of his brother's heinous murder and tragic death, and his corresponding loss of his society and comfort. In his Declaration, which the Plaintiffs attach hereto as Exhibit E and incorporate herein by reference, are details of Alex's anguish and continued grief. In his Declaration, Alex avers, that as a result of the Terrorist Rocket Attack which killed his brother, he suffered significant and extraordinary grief, mental anguish, and emotional distress and that these injuries continue to affect him to this day. *See* Ex. E, ¶12. Alex explains that he and his younger brother David were extremely close. *See* Ex. E, ¶6. They grew up together and even had a double wedding. *See* Ex. E, ¶¶ 6-7. Since his brother's death, Alex has found it difficult to enjoy old hobbies. *See* Ex .E, ¶8. His thoughts about his brother torment him and make his days and nights harder. *See* Ex. E,

11

¶9.  Holidays are difficult to celebrate.  *See* Ex. E, ¶11.  He has found it extremely difficult to watch his nieces, and particularly Michal, withdraw from the family unit.  *See* Ex. E, ¶13.  The change in family dynamics has been a constant source of stress and anxiety and continues to this day.  *See id*.

Prior to his brother's murder, Alex had no significant medical problems.  *See* Ex. E, ¶14. However, since that time, he has developed ███████████████████████████████ ████████  *See id*.  He has also experienced ███████████████ his ability to work and enjoy life.  *See* Ex. E, ¶14. Alex also witnessed the suffering that his brother's death brought his nieces and his mother, Doris, when she was alive.  *See* Ex. E, ¶16.

Alex was interviewed and assessed by Dr. Rael Strous.  Dr. Strous concludes that as a result of the terrorist attack which killed his brother, Alex suffers from some form of ██████ ██████████████████████████████████████████████████████████████████████████████ ██████ either currently or in the past.  *See* Strous Declaration, Ex. B, ¶ 22.  Dr. Strous concludes that many of his symptoms with which he has been diagnosed are likely to be present in varying degrees for a significant time to come and while it is impossible to state for any absolute certainty, he concludes that many of the symptoms may even be permanent.  *See* Strous Declaration, Ex. B. ¶ 23.  In support of his conclusions, Dr. Strous attaches to his Expert Declaration his detailed evaluation of Alexander Lelchook. Strous Declaration, Exhibit B.  The summary of his evaluation concludes,



Strous Declaration, Exhibit B-4, p 9.
Dr. Strous' prognosis for Alexander Lelchook is as follows,



Strous Declaration, Exhibit B-4, p 9 (emphasis added).

Consequently, Alex should receive a baseline IIED damages award of $2.5 million dollars and such significant upward adjustment as the Court deems fair, just and proper for the unbearable loss which Alex has suffered as a result of his brother's murder.

### iv. The Estate of Doris Lelchook

Finally, David Lelchook's mother, Doris Lelchook, who was alive at the time of David's murder but who has now passed away, is entitled to an award for damages to her estate, which is represented herein by her son, Alexander Lelchook, as the duly appointed personal representative of her estate, for severe and unconscionable mental anguish, bereavement, and unbearable grief she suffered prior to her death which resulted from her son's heinous murder and tragic death. From the time of his death until her own passing she was denied the loss of his society and comfort. Prior to her death, Doris executed a Declaration wherein she gives some detail as to her own personal grief and loss. Plaintiffs attach the Declaration of Doris Lelchook as Exhibit F hereto and incorporate same herein by reference. In addition, Doris's personal grief and loss are further explained by her surviving son and personal representative, Alexander Lelchook, in his Declaration. *See* Ex. E. In her Declaration, Doris avers that she experienced extraordinary grief, mental anguish and emotional distress. *See* Ex. F, ¶6. Following his murder she received mental health counseling following her son's murder. *See id*. The distress she suffered made it difficult

for her to carry out daily functions during her life. *See* Ex. F, ¶7. She experienced periods of extreme weight changes. *See id.* And during the remaining years of her life she continued to experience anxiety and overwhelming sadness. *See id.* Following her son's murder, family holidays caused her to experience anxiety. *See id.* Her surviving son, Alex, also witnessed his mother's emotional pain. *See* Ex. E, ¶16. He witnessed that his brother's death caused his mother to go into a deep depression. *See* Ex. E, ¶16. Alexander Lelchook avers that for his mother, David's murder was more painful and devastating than the loss of his father and her husband, which was immensely difficult for her. *See* Ex. E, ¶17. He also observed that following his brother's murder, his mother became quieter and more solitary. *See id.* Because of her son's murder, Doris lived out the remainder of her life, 12 years, in a deep sadness. *Id.*.

Consequently, the Estate of Doris Lelchook should receive a baseline IIED damages award of $5 million dollars and such significant upward adjustment as the Court deems fair, just and proper for the unbearable loss which Doris suffered during the remainder of her life as a result of her son's murder.

## II. PUNITIVE DAMAGES

Under the FSIA, a state sponsor of terrorism may be held liable for punitive damages. *See* 28 U.S.C. §1605A(c). Punitive damages are designed to "punish [the defendant] for [its] outrageous conduct and to deter [it] and others like [it] from [engaging in] similar conduct in the future." Restatement (Second) of Torts § 908(1); *see also Estate of Hirshfeld*, 330 F. Supp. 3d at 148; *see also Bodoff,* 907 F.Supp.2d at 105. "Punitive damages are warranted where 'defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization and murder of American citizens and others.'" *Braun*, 228 F.Supp.3d at 86. Here this Court should

14

find that punitive damages are warranted to punish Syria for its material support of Hezbollah, the designated Foreign Terror Organization that murdered David Lelchook.

Punitive damages serve to "punish and deter the actions for which they are awarded." *Murphy*, 740 F. Supp. 2d at 80. Four factors determine the amount of punitive damages: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Id.* Punitive damage awards under the FSIA serve multiple purposes:

> [b]y creating these rights of action, Congress intended that the Courts impose a substantial financial cost on states which sponsor terrorist groups whose activities kill American citizens. This cost functions both as a direct deterrent, and also as a disabling mechanism: if several large punitive damage awards issue against a foreign state sponsor of terrorism, the state's financial capacity to provide funding will be curtailed.

*Flatow*, 999 F. Supp. at 33.

28 U.S.C. § 1605A(c) specifically allows the award of punitive damages for personal injury or death resulting from an act of state-sponsored terrorism. In recognition of the difficulty of bringing terrorists to justice personally, Congress created jurisdiction over, and rights of action against, their foreign state sponsors. Punitive damage awards under the FSIA serve multiple purposes:

> [b]y creating these rights of action, Congress intended that the Courts impose a substantial financial cost on states which sponsor terrorist groups whose activities kill American citizens. This cost functions both as a direct deterrent, and also as a disabling mechanism: if several large punitive damage awards issue against a foreign state sponsor of terrorism, the state's financial capacity to provide funding will be curtailed.

*Flatow*, 999 F. Supp., 33. Premeditated violence against civilian targets is not a legitimate action by any government. It does not matter whether such violence is undertaken directly or indirectly. Therefore, in addition to the traditional focus of punitive damages upon individual punishment and

general deterrence, this law emphasizes specific deterrence of the transgressing state sponsors of terrorism so that future sponsorship may be prevented.

In cases that have calculated the punitive damages for state sponsors of terrorism, such as *Acosta*, 574 F. Supp. 2d, 31, the court held that a three times multiplier should be applied to the state sponsor of terrorism's annual budget for terrorism in order to determine an appropriate punitive damage award to adequately deter state sponsors of terrorism. Moreover, in *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 30-31 (D.D.C. 2009), the court saw no reason to depart from the *Acosta* methodology in calculating punitive damages as this methodology was considered to have the requisite deterrent effect. *See id.*

In *Valore*, the court upheld the methodology in *Heiser* and *Acosta* but used a five times multiplier of annual state sponsored terrorism expenditures, rather than the three times multiplier used in *Heiser* and *Acosta*.  The court held specifically that two numbers are at issue: the multiplicand-the amount of the state sponsor of terrorism's annual expenditures on terrorist activities-and the multiplier-the factor by which the multiplicand should be multiplied to yield the desired deterrent effect. *See* i*d.* Chief Judge Lamberth awarded one billion dollars in punitive damages against Iran in *Valore*.

Syria, as a state sponsor of terrorism, spends between U.S. $500,000,000 (at a minimum) and U.S. $700,000,000 annually on terrorism-related expenditures.  *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 85 (D.D.C. 2011).  Accordingly, using a three to five times multiplier of these amounts would result in a punitive damages range of $1.5 billion to $3.5 billion. It should also be noted that even in cases where a state sponsor of terrorism's expenditures are not known, punitive damages of up to $300 million dollars have been awarded. *See Calderon-Cardona v. Democratic People's Republic of Korea*, 723 F. Supp. 2d 441 (D.P.R. 2010). In *Baker*

*v. Socialist People's Libyan Arab Jamahiriya*, the court made a determination that the appropriate amount for punitive damages was $150 million per victim and their families.

Similarly, in *Gates*, the measure applied by the court in awarding $300 million dollars was $150 million dollars per family for each of the two families. Judge Collyer found that with regard to Syria's sponsorship of terrorism in the year of 2004, "[p]remeditated violence against civilian targets is not a legitimate action by any government. Civilized society cannot tolerate states whose partnership with terrorist surrogates…is formed for the purpose of achieving political victory through heinous acts of barbarism". *Gates*, 580 F. Supp. 2d, 74.

Moreover, it must be noted that the Syrian Arab Republic was first placed on the US Department of State List of State Sponsors of Terror in 1979, when the list was first created. Syria has remained, and remains to this day, as a designated State Sponsor of Terror. Considering each of the stated purposes of punitive damages, noting that Syria remains a sponsor of Hezbollah, the Foreign Terror Organization, and in order for this Court to send the loudest message possible that Syria's continued support for terror will not be countenanced, not only for deterrence purposes, but also to punish Syria for its outrageous and sustained support of terror, this Court should impose the highest possible punitive damages award that the Court deems to be fair, just and proper under the circumstances. Such an award will not only punish and deter but also serve as a disabling mechanism to help stop the continued ability of the Syria to provide funding to terrorist organizations.

Therefore, the Court should find that the range of appropriate punitive damages can be found in such awards as *Heiser*, *Acosta* and *Valore*, which used the multiplier of terrorism related expenditures ranging from three to five times the annual expenditure on terrorism ($1.5 to $3.5

billion), or at a minimum make an award to the Lelchook family of $150 million dollars in punitive damages.

## **CONCLUSION**

WHEREFORE, for the reasons set forth above and in accordance with the damages evidence Plaintiffs have submitted, Plaintiffs request that this Court enter damages awards on their behalf to Ester Lelchook, as the legal representative of the Estate of David Lelchook for the wrongful death of her husband, David Lelchook, and on behalf of Michal Lelchook, Yael Lelchook Galili, Alexander Lelchook, individually and as the representative of the Estate of Doris Lelchook, for the IIED claims of Michal Lelchook, Yael Lelchook Galili, Alexander Lelchook and Doris Lelchook.  Plaintiffs further request that the Court  make an award to the family for punitive damages commensurate with the standards for punitive damages, to punish and to deter the heinous acts of terror supported by the Syrian Arab Republic, in accordance with the averments herein and consistent with those set forth by Courts in this District.

Dated: July 15, 2019                                                      Respectfully submitted,

                                                                                       HEIDEMAN NUDELMAN
                                                                                       & KALIK, P.C.
                                                                                       1146 19th Street, N.W., 5th Floor
                                                                                       Washington, DC 20036
                                                                                       Telephone:  202-463-1818
                                                                                       Telefax:  202-463-2999

                                                                                       By: */s/ Tracy Reichman Kalik*_____
                                                                                             Richard D. Heideman (No. 377462)
                                                                                             Noel J. Nudelman (No. 449969)
                                                                                             Tracy Reichman Kalik (No. 462055)

.