# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ESTER LELCHOOK, *et al.* | : | |
| Plaintiffs, | : | Civil Action No.: 16-1550 (RC) |
| v. | : | Re Document Nos.: 27, 28, 29 |
| SYRIAN ARAB REPUBLIC, | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

**GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT**

## I. BACKGROUND

On August 2, 2006, one of the thousands of rockets and missiles launched by Hezbollah that summer struck Kibbutz Saar in northern Israel, fatally injuring kibbutz resident David Lelchook. Compl. ¶¶ 14–15, ECF No. 1. Plaintiffs Ester Lelchook,[1] Michal Lelchook, Yael Lelchook, Alexander Lelchook, and the Estate of Doris Lelchook,[2] respectively the spouse, two daughters, brother, and mother of David Lelchook, brought suit against Defendant the Syrian Arab Republic pursuant to the Foreign Sovereign Immunity Act ("FSIA") terrorism exception, 28 U.S.C. § 1605A(a). Alleging that Syria's provision of "material support" to Hezbollah

---

[1] Ester Lechook, the decedent's surviving wife, brought a wrongful death claim on behalf of the Estate of David Lelchook. *See* Compl. ¶ 4.

[2] Doris Lelchook filed suit in 2016 along with the other four Plaintiffs, but passed away on December 5, 2018, in Alexandria, Virginia, whereupon Alexander Lelchook was appointed as executor of her estate. *See* Pls.' Mot. Substitute Exs. A–B, ECF No. 24-1; *Lelchook v. Syrian Arab Republic* ("*Lelchook II*"), No. 16-1550 (RC), 2019 WL 2191177, at *1 (D.D.C. Mar. 25, 2019). Because "Virginia law . . . allows a decedent's estate to maintain any cause of action that the decedent would have been able to assert during his or her life," *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 297 (D.D.C. 2005) (citing Va. Code. § 8.01-25), and because Plaintiffs' motion to substitute was timely brought, this Court granted Plaintiffs' motion to substitute Alexander Lelchook as the executor of Doris Lelchook's Estate, *Lelchook II*, 2019 WL 2191177, at *1.

rendered it liable for the extrajudicial killing of David Lelchook, *id.* ¶ 21, Plaintiffs sought damages for extrajudicial killing and wrongful death, *id.* ¶¶ 23–29, and intentional infliction of emotional distress ("IIED") and solatium, *id.* ¶¶ 30–36. After Defendant failed to enter an appearance, Plaintiffs moved for entry of default, *see* ECF No. 14, which the Clerk of Court granted on September 20, 2017, *see* ECF No. 15. Plaintiffs then moved for entry of default judgment. *See* ECF No. 17.

In a prior ruling, this Court granted in part Plaintiffs' motion for default judgment regarding liability. *See generally Lelchook II*, 2019 WL 2191177. Accepting the thoughtful and thorough report and recommendation by Magistrate Judge Meriweather, *see Lelchook v. Syrian Arab Republic* ("*Lelchook I*"), No. 16-1550 (RC/RMM), 2019 WL 2191323 (D.D.C. Jan. 31, 2019), the Court concluded that it had subject matter jurisdiction over the suit, that Plaintiffs each had a private right of action under the FSIA, and that Plaintiffs presented viable theories of liability regarding (1) Ester Lechook's wrongful death claim on behalf of the Estate of David Lelchook and (2) Michal, Yael, Alexander, and the Estate of Doris Lelchook's IIED claim. *Lelchook II*, 2019 WL 2191177, at *2–3. The question now facing the Court is the measure of damages to award for each of these claims pursuant to the FSIA's federal cause of action. *See* 28 U.S.C. § 1605A(c). For the reasons set forth below, the Court will enter default judgment for economic damages and compensatory damages and deny punitive damages.

## II. LEGAL STANDARD FOR DAMAGES UNDER THE FSIA

Under the FSIA, a plaintiff may recover "economic damages, solatium, pain and suffering, and punitive damages." § 1605A(c)(4). "To obtain damages, the plaintiff must prove that the consequences of the defendant['s] acts were reasonably certain to occur, and they must prove the amount of damages by a reasonable estimate." *Reed v. Islamic Republic of Iran*, 845 F.

Supp. 2d 204, 213 (D.D.C. 2012) (citing *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003); *see also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010). The consequences of a defendant's acts are "reasonably certain . . . to occur" when they are "more likely than not." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 82 (D.D.C. 2017) (quoting *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015)); *see also Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 37 (D.D.C. 2012). To prove the amount of a damages by "a reasonable estimate consistent with this [Circuit]'s application of the American rule on damages," *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (internal quotations omitted) (quoting *Hill*, 328 F.3d at 681), a court may consider expert testimony as well as comparable awards in similar cases, *see Braun*, 228 F. Supp. 3d at 82; *Reed*, 845 F. Supp. 2d at 214; *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).

### III. ANALYSIS[3]

The Lelchooks seek damages against Syria pursuant to the FSIA. *See* Pls.' Mem. Setting Forth Damages Evid. ("Pls.' Mem."), ECF No. 29. More precisely, Ester Lelchook, as the representative of the Estate of David Lelchook, seeks economic damages for the wrongful death of David Lechook, *id.* at 2, and Michal, Yael, Alexander, and the Estate of Doris Lelchook seek

---

[3] Plaintiffs' evidentiary showing to establish liability has already established "that a 'reasonable connection' existed 'between the material support provided [by Defendant] and the ultimate act of terrorism." *Lelchook I*, 2019 WL 2191323 at *10 (quoting *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 204 (D.D.C. 2017)). This showing to establish proximate causation was necessary to establish Defendant's liability. *See id.* at *9–10. This same evidentiary showing also discharges Plaintiffs' burden to establish that the consequences of Defendant's action were "reasonably certain." Thus, the Court's analysis here addresses only the amount of damages that are appropriate based upon Plaintiffs' evidentiary showing.

3

compensatory damages[4] for their IIED claim, *id.* at 4. All five Plaintiffs also seek punitive damages, which the Court will briefly discuss before addressing the other claims for relief.

### A. Punitive Damages

As established in this Court's prior judgment in this case, *see Lelchook II*, 2019 WL 2191177, and as discussed in depth in Magistrate Judge Meriweather's Report and Recommendation, *see Lelchook I*, 2019 WL 2191323, at *5–6, entry of liability against Syria, a foreign sovereign, was authorized pursuant to the FSIA's "terrorism exception," as codified at 28 U.S.C. § 1605A. This Circuit has made clear that "the FSIA terrorism exception does not retroactively authorize the imposition of punitive damages against a sovereign for conduct occurring before the passage of § 1605A" in 2008. *Owens v. Republic of Sudan*, 864 F.3d 751, 812 (D.C. Cir. 2017). Because Defendant's conduct occurred on August 2, 2006, before the passage of section 1605A, the FSIA does not retroactively authorize the imposition of punitive damages here. Thus, the Court denies Plaintiffs' motion for entry of default judgment regarding punitive damages.

### B. Economic Damages for Wrongful Death Claim

Ester Lelchook, acting as the legal representative of the Estate of David Lelchook, seeks to recover for economic loss caused by the death of David Lelchook in Defendant's missile attack.[5] *See* Pls.' Mem. 2. The FSIA permits "[a] wrongful-death action" to be "brought

---

[4] Although Plaintiffs style their request as one for economic and punitive damages, the Court reads Michal, Yael, Alexander, and the Estate of Doris Lelchook's IIED claims to seek relief in the form of compensatory damages. *See Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affairs, et al.*, 892 F.3d 348, 356–57 (D.C. Cir. 2018) (referring to award of damages in response to a claim for mental anguish and suffering as a compensatory damage).

[5] Plaintiffs' argument invokes state statutory law as the legal authority under which this Court should award economic damages. *See* Pls.' Mem. at 2 (citing D.C. Code Ann § 16-2701 (2001). However, this turn to state law is not necessary to establish a substantive authority for the award of economic damages: under the FSIA, "estates of those who did not survive [an

4

through the estate of the decedent[] 'for economic losses which result from a decedent's premature death.'" *Valore*, 700 F. Supp. 2d at 78 (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998), *abrogated on other grounds*); *see also Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 74 (D.D.C. 2010). In a suit under the FSIA, "the report of a forensic economist may provide a reasonable basis for determining the amount of economic damages." *Reed*, 845 F. Supp. 2d at 214; *see also Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 24 (D.D.C. 2009) (relying on forensic economist's report in calculation of economic damages). Where a court relies upon such a report, it is to consider the "reasonableness and foundation of the assumptions relied upon by the expert." *Roth*, 78 F. Supp. 3d at 402 (citing *Reed*, 845 F. Supp. 2d at 214).

In this case, Plaintiffs offer an expert report compiled by Chad Staller and Stephen Dripps, who serve as president and senior economist at the Center for Forensic Economic Studies, as evidence of economic loss sustained by the Estate of David Lelchook. *See* Pls.' Mem., Expert Report of Chad Staller and Stephen Dripps ("Staller & Dripps Expert Report"), ECF No. 29-1. This report establishes that, based on the average retirement age of 67 for an Israeli male, David Lelchook would have worked 15.3 more years, *id.* at 2, and accrued

---

attack] can recover economic losses stemming from wrongful death of the decedent." *Valore*, 700 F. Supp. 2d at 83; *see also Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 339 (D.D.C. 2014) (discussing relevant FSIA provision); 28 U.S.C. 1605A(c)(4) (stating that damages in a private cause of action authorized by the FSIA "may include economic damages"). This federal statutory authorization regarding *damages* sits in contrast to the *liability* stage of a suit under the FSIA, wherein a plaintiff invoking section 1605A's private right of action must "prove a theory of liability," *Valore*, 700 F. Supp. 2d at 73, typically through "the lens of civil tort liability," to establish a claim for relief that entitles them to damages, *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 175–76 (D.D.C. 2010). Because Plaintiffs have already established Defendant's liability for the torts of wrongful death and IIED, *see Lelchook II*, 2019 WL 2191177, at *2, the Court looks directly to section 1605A(c) in its damages analysis.

5

1,889,909₪ in earnings, *id.* at 7.⁶  Upon retirement, he would have been eligible for pension benefits until age 84.5, his projected age at death based on statistical averages, *id.* at 2, 4, and received 727,200₪ in pension benefits, *id.* at 7.  The report also describes the value of lost household services that David Lelchook would have performed between the privatization of Kibbutz Saar in 2008 and the expected loss of his functional capacity at age 70 in the year 2024, *id.* at 4, amounting to a predicted value of 315,478₪, *id.* at 7.  Based on this forensic evidence, after accounting for personal maintenance expenses, the net economic loss amounts to 1,014,790₪, which converts to $285,665.⁷  *Id.* at 7.  Finding these predictions to be based upon reasonable assumptions and associated calculations, the Court awards $285,655 in economic damages for Ester Lelchook's wrongful death claim on behalf of David Lelchook's Estate.⁸

### C. Compensatory Damages for IIED Claims

The remaining four Plaintiffs—Michal Lelchook, Yael Lelchook, Alexander Lelchook, and the Estate of Doris Lelchook—seek compensatory damages for Defendant's intentional infliction of emotional distress.  In the context of a suit under the FSIA, courts in this Circuit have found IIED and solatium claims to be "indistinguishable."  *Estate of Heiser v. Islamic Republic of Iran* ("*Heiser II*"), 659 F. Supp. 2d 20, 27 n.4 (D.D.C. 2009) (quoting *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 (D.D.C. 2002) (quoting Black's Law Dictionary 1397 (7th ed. 1999))); *see also Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015).  Thus, in calculating the appropriate amount of compensatory damages,

---

⁶ The expert report presents these figures in New Israeli shekels (₪).  The final award amount is converted to present value U.S. dollars, as discussed below.

⁷ In calculating the award amount, future values were discounted to their present value.  Staller & Dripps Expert Report 5.

⁸ The exchange rate as of July 11, 2019, was used to convert New Israeli shekels to U.S. dollars.  Staller & Dripps Expert Report 6 n.18.

the Court considers only the IIED theory of relief, although its analysis takes into account "prior decisions awarding damages for intentional infliction of emotional distress as well as decisions regarding solatium."[9] *Valore*, 700 F. Supp. 2d at 85 (citing *Acosta*, 574 F. Supp. 2d at 29); *see also Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C. 2006).

Given the importance of "ensur[ing] that individuals with similar injuries receive similar awards," courts in this jurisdiction confronting FSIA claims have adopted a general framework as "an appropriate measure of damages for the family members of victims who died" in a terrorist attack. *Peterson v. Islamic Republic of Iran,* 515 F. Supp. 2d 25, 51, 54 (D.D.C. 2007), *abrogation on other grounds recognized by Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48 (D.D.C. 2013); *see also Valore*, 700 F. Supp. 2d at 85–86 (D.D.C. 2010) (noting "strong precedential support" for framework); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 57–58 (D.D.C. 2009); *Heiser II*, 659 F. Supp. 2d at 27 n.4. Seeking consistency, this Court will follow this approach.

This damages framework, first set forth in *Estate of Heiser v. Islamic Republic of Iran* ("*Heiser I*"), 466 F. Supp. 2d 229 (D.D.C. 2006), begins with baseline amounts and permits upward or downward departures. The familial relationship between the victim and the family member determines the baseline amount of the damages award, *see Peterson*, 515 F. Supp. 2d at 51, with valid claims by parents or children of a victim awarded $5 million and siblings of the

---

[9] There are two additional reasons for this approach. First, Plaintiffs' memorandum supporting damages does not seek to recover on their solatium claim, for which this Court did not enter a finding regarding liability. *See Lelchook I*, 2019 WL 2191323, at *17 (recommending entry of default judgment regarding liability on Plaintiffs' IIED claim and declining to reach Plaintiffs' solatium claim as a theory of liability); *Lelchook II,* 2019 WL 2191177 (adopting *Lelchook I* report and recommendation). Second, even if this were not the case, because both the IIED and solatium claims arise from the same predicate events, Plaintiffs may not recover under both theories of relief. *See Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C. Cir.) ("Where there has been only one injury, the law confers only one recovery, irrespective of the multiplicity of . . . theories which the plaintiff pursues.").

victim awarded $2.5 million, *Heiser II*, 659 F. Supp. 2d at 27 n.4. *See also Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 146–47 (D.D.C 2018); *Braun*, 228 F. Supp. 3d at 85. Upward departures from this general framework are appropriate "in cases 'with aggravating circumstances,' indicated by such things as '[t]estimony which describes a general feeling of permanent loss or change caused by decedent's absence' or '[m]edical treatment for depression and related affective disorders.'" *Valore*, 700 F. Supp. 2d at 85–86 (quoting *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006), then quoting *Flatow*, 999 F. Supp. at 31). The court's assessment, which "cannot be defined through models and variables," may also consider "[h]ow the claimant learned of [the] decedent's death, and whether there was an opportunity to say good-bye or view the body," which "can be a significant factor contributing to the claimant's anguish," as well as "[t]he nature of the relationship between the claimant and the decedent," particularly if it was "strong and close." *Fraenkel*, 892 F.3d at 356–57 (quoting *Flatow*, 999 F. Supp. at 29–30)). "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case." *Braun*, 228 F. Supp. 3d at 85 (quoting *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26–27 (D.D.C. 2011)).

With these principles in mind, the Court will assess Plaintiffs' compensatory damages claims.[10] For the reasons set forth below, the Court awards a 25% upward departure for Michal and Yael, a 10% upward departure for Alexander, and the baseline amount to the Estate of Doris.

---

[10] Plaintiffs do not request specific upward departures, but rather ask that the Court award each individual the baseline amount indicated by their familial relationship to David Lelchook and "such significant upward adjustment as the Court deems fair, just, and proper." Pls.' Mem. 9, 11, 13, 14.

1. Michal Lelchook

Michal Lelchook, one of the two daughters of David Lelchook, "experienced and continues to experience severe and unconscionable mental anguish, bereavement, and unbearable grief" after her father's death. Pls.' Mem. 7. According to Michal's sworn declaration, she first learned of her father's death through a telephone call from her mother. Declaration of Michal Lelchook ("Michal Declaration") ¶ 5, ECF No. 29-3. She was working in the United States and hence needed to travel to Israel alone for the funeral, despite feeling "devastated and very scared." *Id.* Because Michal and her father were "extremely close," she "experienced extraordinary grief, mental anguish, and emotional distress." *Id.* ¶ 4. Her feelings of disorientation and shock persisted after the funeral. *Id.* ¶ 6. Because the same rocket had destroyed her family home on the Kibbutz, she "no longer had a physical or emotional home to return to," and she also felt unable to return to her previous employment. *Id.* ¶ 7.

These deep feelings of grief and distress did not dissipate. Over a decade after the attack, Michal "continue[s] to constantly feel that [her] father's murder was the worst thing in the world that could have happened to [her]." *Id.* ¶ 6. Her "pain and loss have caused [her] to become directionless in life" and "stuck at the time" of her father's murder. *Id.* ¶ 8. Although she received mental health counseling from a psychiatrist after the funeral, she was not able to continue with treatment because it was "too painful." *Id.* ¶ 9. Other alternative treatment modalities were also unhelpful to Michal, and nothing has taken away her pain. *Id.* Michal continues to struggle with daily activities, has experienced difficulty remaining employed, *id.* ¶ 10, and finds it difficult to make social connections or participate in social interactions because of her ongoing "feelings of isolation, inferiority, and weakness in life," *id.* ¶ 11. She also suffers from hypersensitivity to noises and experiences "frequent" "flashbacks" to her father's death,

including "memories of where [she] identified [her] father's body in the morgue" and "the site of [her] destroyed house." *Id.* ¶ 12. These reports are affirmed by the psychiatrist who examined Michal, which Plaintiffs filed under seal with the Court given the sensitive personal nature of the report. *See* Expert Declaration of Dr. Rael Strous ("Strous Expert Decl.") ¶¶ 20–21, ECF No. 29-2.[11]

The evidence offered illustrates that Michal Lelchook has been and continues to be psychologically affected by her father's death. Michal states that she was very close to her father (although no elaboration is provided or examples given indicating that this father-daughter relationship was closer than the norm). In addition, she never had the opportunity to say goodbye before learning of his death through a telephone call with her mother. These factors suggest that an upward adjustment is in order. Other courts have authorized upward departures where individuals are particularly affected by an event, such as a $3 million increase for an individual who suffered a "nervous breakdown" and required a year of medication after her sister's death, *see Estate of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 43 (D.D.C. 2012), or a 25% upward departure for a brother who was so affected by his grief that he became socially reclusive, found it difficult to pursue a career, and engaged in substance abuse, *see Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 68 (D.D.C. 2011). Here, given the length of time—over 13 years—for which Michal has been affected, the existence of some of the aggravating factors found in *Baker*, her unsuccessful efforts to obtain psychological or medical relief for her condition, and the ongoing "general feeling of permanent

---

[11] Because the parties did not label each of the assessments as individual exhibits and instead submitted the sealed expert declaration as a single ECF attachment, the Court refers to the ECF page numbers in its discussion of the Strous Expert Declaration.

loss or change caused by decedent's absence," *Valore*, 700 F. Supp. 2d at 86 (quoting *Flatow*, 999 F. Supp. at 31), the Court finds a 25% upward departure to be appropriate.

### 2. Yael Lelchook[12]

Yael Lelchook, David Lelchook's older daughter, avers that she was "extremely close" with her father and "experienced extraordinary grief, mental anguish, and emotional distress" that affect her to this day as a result of his death in the August 2, 2006 rocket attack. Declaration of Yael Lelchook Galili ("Yael Decl.") ¶ 4, ECF No. 29-4. During summer of 2006, Yael was a student at the Wingate Institute in Israel. *See* Strous Expert Decl. 20, ECF No. 29-2. She learned of her father's death when she saw a "body bag with [her] father on the news," whereupon she was so distraught that she "immediately started to scream." Yael Decl. ¶ 4. For six months after her father's death, she was unable to sleep or continue in her studies. *Id.* ¶ 6. Her grief persisted and Yael suffered from "nightmares so intense" that she did not sleep consistently through the night for about two years. *Id.* ¶ 7. To attempt to heal, she sought mental health counseling and received treatment from a psychiatrist for three and a half years. *Id.* ¶ 5. For approximately seven and a half years, Yael's "life was controlled" by the attack. *Id.* ¶ 8. She "barely lived life" and "went through the motions of living" without the ability to build "any close relationships" due to fear of loss, living in "overwhelming anger and fear" until she "drove [herself] to become emotionally numb." *Id.*

Although, with time, Yael was able to build relationships and cultivate a family of her own, *id.*, she "feel[s] that [she] can never fully 'move-on' from the loss," *id.* ¶ 9. She carries the "weight of [her] emotional baggage" and experiences "pessimistic and apathetic feelings towards

---

[12] Plaintiffs' Memorandum regarding damages refers to Yael Lelchook as "Yael Lelchook Galili." *See* Pls.' Mem. at 9. Because she was previously referred to as Yael Lelchook in Plaintiffs' complaint, *see* Compl. at 1, the Court uses the name "Yael Lelchook" for consistency.

11

much of [her] life." *Id.* To this day, she cries, tenses up, and shakes when she talks about her father, and until very recently, she remained unable to attend events that resurfaced her grief, such as the softball match played in his memory. *Id.* In addition, because her "father's murder created a difficult relationship between" Yael, her mother, and her sister, at times leading Yael to distance herself from them and feel "estranged" from them, her father's death has fundamentally affected her family structure. *Id.* ¶ 10.

On the evidence provided, it is clear that Yael experienced significant, enduring psychological suffering as a result of the attack. Yael learned of her father's death in a distressing and impersonal manner, without the opportunity to say goodbye, and was so affected by her grief that she began screaming and cannot recall more than a "blur." *Id.* ¶ 4. Her immediate reaction as well as her subsequent grieving period were extremely painful for Yael, and she lost her sense of place in the world. *See* Strous Expert Decl. at 21–22. Thereafter, her life trajectory was altered, *id.* at 22, and she struggled for almost a decade after the rocket attack—to the extent that she required ongoing psychiatric treatment to redress her strong grief reaction, Yael Decl. ¶ 5. Although she began to heal more significantly with the passage of time, based on the expert report submitted under seal, her life trajectory was altered by her father's death and she required medical intervention to re-center her life. *See* Strous Expert Decl. at 25. Moreover, she remains pained by the loss of her father to this day in ways that affect her mental outlook. *Id.*; *see also* Yael Decl. ¶ 9. Although Yael appears to now be doing much better than her sister, having married and raising children, she suffered the same loss as Michal and the Court will not lower her compensation award because she sought the appropriate medical attention. The Court thus finds that Yael has demonstrated "mental anguish in excess of that

12

which would have been experienced following decedent's natural death," *Flatow*, 999 F. Supp at 31, and will award a 25% upward departure.

### 3. Alexander Lelchook

Alexander Lelchook, the older brother of David Lelchook, also seeks compensatory damages for the "anguish and continued grief" caused by his sibling's death. Pls.' Mem. 11. Alexander relates the "extremely close" relationship that he shared with his brother and the manner in which David "looked up to [him] as a mentor." Declaration of Alexander K. Lelchook (Alexander Decl.) ¶ 6, ECF No. 29-5. The brothers' "mutual respect created a strong bond" between them, and they were "so connected" that they had a "double wedding." *Id.* ¶¶ 6–7. David's death thus affected Alexander's psychological state significantly. *Id.* ¶¶ 8–9. For several years after his brother's death, he thought about his brother when he "was alone doing things" that he had previously enjoyed, *id.* ¶ 8, and to this day, Alexander avers that the loss of David caused him to become "less happy-go-lucky" in his attitude toward life. *Id.* ¶ 9. Thoughts of his brother and "what his death means" "torment him," and the anxiety that Alexander experienced since David's death "often cause[] [him] to overthink [his] feelings." *Id.* At times, his "extreme distress" has made it difficult to carry on with his daily functions. *Id.* ¶ 12. Alexander is especially affected around family holidays and the Jewish holidays because David's absence leads him to "feel his loss immeasurably." *Id.* ¶ 11.

Alexander also states that David's death has strained his psychological and physical health in other ways. *Id.* ¶¶ 13–14. He describes how the loss of David has profoundly affected the family structure in ways that cause him great distress. *Id.* ¶ 13. As David's older brother, Alexander feels a "responsibility" to "help maintain the unity" of the Lelchook family—a responsibility that he believes he has not been able to fulfill. *Id.* He particularly underscores

both the impact of Michal's ongoing suffering and "withdrawal" and the "stress and anxiety" that he feels due to the altered family dynamics. *Id.* Alexander emphasizes his at times "daily concern" for the physical and mental state of his sister in law (Ester Lelchook) and his nieces (Michal and Yael Lelchook). *Id.* Alexander avers that this "chronic stress and frustration" has affected his physical wellbeing. *Id.* ¶ 14. Although Alexander did not suffer from any significant medical problems before David's death, he has since developed high blood pressure and struggled to enjoy life and work due to significant sleep deprivation. *Id.* Alexander's sleep has improved with time, yet he still experiences occasional "flashbacks of David and the situation surrounding his murder" when he prepares for bed. *Id.* He also remains particularly affected when he is with friends and the conversation turns to their families in Israel, which resurfaces "the loss and emptiness" that Alexander feels in David's absence. *Id.* ¶ 15. To this day, talking about his brother makes Alexander very emotional and causes him to become "sweaty, tense, emotional, and often cry." *Id.*; *see also* Strous Expert Decl. 83.

As noted previously, the Court must determine whether to apply an upward adjustment from the $2.5 million baseline for siblings of the decedent based on factors that include, as is most salient here, "the nature of the relationship [between plaintiff and victim] and the severity and duration of the pain suffered by the family member." *Greenbaum*, 451 F. Supp. 2d at 107 (quoting *Haim*, 425 F. Supp. 2d at 75). Taking the second factor first, Alexander's grief appears profound, and his commitment to maintaining his family structure from halfway across the world, notwithstanding the personal toll that this has taken upon him, is commendable. But even recognizing the ongoing psychological effects of the loss of his brother, Strous Expert Decl. 85, this Court must bear in mind "the general equitable principle" that a claim in a given case is to be benchmarked against "awards in similar cases," *Oveissi*, 768 F. Supp. 2d at 30 (quoting *Brewer*,

664 F. Supp. 2d at 55). Without in any way minimizing Alexander's psychological suffering, the evidence provided does not suggest the sort of "particularly devastating and uniquely acute suffering," *Murphy*, 740 F. Supp. 2d at 79, for which other courts have authorized significant upward adjustments, such as "several nervous breakdowns, at least one of which required hospitalization," *Oveissi*, 768 F. Supp. 2d at 30 (quoting *Valore*, 700 F. Supp. 2d at 86).

That said, the nature of the brothers' relationship and the family dynamics are unique here. In assessing the relationship between an individual claimant and an individual killed by a terrorist attack, the Court is to consider factors such as "strong emotional ties between the claimant and the decedent" and the "decedent's position in the family birth order relative to the claimant." *Frankel*, 892 F.3d at 357 (quoting *Flatow*, 999 F. Supp. at 31–32). Here, Alexander provides specific evidence, such as the brothers' double wedding, of their especially close bond, and his status as the eldest brother of the decedent has led him to carry an emotional burden within the family structure. Alexander Decl. ¶¶ 6–7, 13. And, at the time of the terrorist attack, David (the decedent) was planning to visit Alexander in America to spend Thanksgiving with his family. Strous Expert Decl. 79; *see also* Declaration of Doris E. Lelchook ("Doris Decl.") ¶ 7, ECF No. 29-6. Given such evidence in tandem with the manner in which the death of his brother has permanently changed Alexander's general outlook on life, the Court finds that an upward adjustment of 10% is appropriate.

4. Estate of Doris Lelchook

Finally, the Court must consider the measure of damages to award to the Estate of Doris Lelchook. The baseline award for a parent of the decedent, and the figure with which the Court begins, is $5 million. As described previously, Doris Lelchook, the mother of David Lelchook, was alive at the time of her son's death and when the complaint was filed but has since passed

15

away.[13]  In her declaration, Doris avers that her son's death caused her "extraordinary grief, mental anguish, and emotional distress" that "made it difficult at times" for her to carry out her "daily functions."  Doris Decl. ¶¶ 6–7.  Doris thus sought mental health counseling.  *Id.* ¶ 6.  Despite this counseling, she continued to have trouble "discuss[ing] the circumstances of [her] son's death and the empty feeling" that she continued to carry.  *Id.*  The Thanksgiving holiday was especially challenging for Doris each year because it "remain[ed] a reminder" of David's death, *id.*, and throughout the year, discussions of "David's life in Israel" no longer brought Doris the "happiness and delight" she had previously experienced.  *Id.*  Doris also struggled with weight changes after the loss of her son.  *Id.*  Although she gradually returned to her former weight, *id.*, Doris's psychological suffering continued, *see id.* ¶¶ 6–8.

"No amount of money can alleviate the emotional impact of a child's" death, *Flatow*, 999 F. Supp. at 32, yet this Court must determine the amount of damages supported by the evidence provided.  Here, there is a lack of specific evidence to sustain an upward departure from the baseline amount.  Without an evaluation by a psychiatrist to elaborate on Doris's statements and without further details from Doris, the Court cannot ascertain whether her grief caused a "permanent loss or change"—beyond the extraordinary grief that one might expect from the loss of a child—that "changed [her] life in significant and grave ways."[14]  *Oveissi*, 768 F. Supp. 2d at

---

[13] Because of Doris's passing, no expert psychological evaluation is available.  The Court's analysis thus rests on the materials presented to it: a declaration that Doris executed prior to her death and the admissible, non-hearsay statements presented in the sworn declaration of Alexander Lelchook, the legal representative of her estate.

[14] To be sure, Alexander Lelchook states that his mother went into a "deep depression" upon learning of her son's death, Alexander Decl. ¶ 16, and that his mother "experienced sleeplessness and anxiety" and "became quieter and more solitary" as a result of David's death, *id.* ¶ 17.  But standing alone, these statements do not allow the Court to ascertain whether her "mental anguish" surpasses that which she would have experienced had her son died of natural causes, *see Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 90 (D.D.C. 2002) (citing *Flatow,* 999 F. Supp. at 30–31).  Moreover, the Court cannot credit the third-party report that

28; *see also id.* at 29 (authorizing enhanced damage award for plaintiff who is "compelled" to "constantly remember" the victim's death, which "defined" the plaintiff's own identity). Moreover, the documents provided do not establish that other "circumstances surrounding the terrorist attack . . . made it particularly agonizing" in a manner that could support an upward departure, *Estate of Hirshfeld*, 330 F. Supp. 3d at 147 (citing *Oveissi*, 768 F. Supp. 2d at 26-27). Nor does Doris describe the nature of the relationship with her son, *see generally* Doris Decl., which is another factor that the Court is to consider in determining the damages amount (it appears that they lived half a world apart from one another and there is no evidence presented about how often they communicated with or visited one another). Lacking further evidence or greater detail, the Court looks to the damages framework for guidance. *Heiser I* itself awarded $5 million to the mother who was "devastated" by her son's death, experienced difficulty sleeping, and felt "pain in [her] chest that never goes away." 466 F. Supp. 2d at 288. Following *Heiser*'s framework, the Court feels restrained to award no more than $5 million to the Estate of Doris Lelchook.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for default judgment is **GRANTED IN PART** and **DENIED IN PART**. The Court awards economic damages in the amount of $285,665 to Ester Lelchook, acting as the legal representative of David Lelchook's Estate, and compensatory damages in the amount of $20,250,000, with $6,250,000 apportioned to Michal Lelchook and Yael Lelchook, respectively, $2,750,000 apportioned to Alexander Lelchook, and $5,000,000 apportioned to the Estate of Doris Lelchook. The Court denies Plaintiffs' claim for

---

Doris "found David's murder more painful and devastating than the loss of . . . her husband." Alexander Decl. ¶ 17. Thus, mindful of the need for consistency across FSIA cases involving similar facts, the Court is unable to authorize an upward departure on the evidence provided.

17

punitive damages. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 25, 2019               RUDOLPH CONTRERAS
                                        United States District Judge